**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Danielle Dickson GATLOS, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 25, 2013.

Filed Sept. 10, 2013.

Coley O. Reynolds, Philadelphia, for appellant.

Nicholas J. Casenta, Jr., Assistant District Attorney, West Chester, for Commonwealth, appellee.

BEFORE: LAZARUS, OLSON AND FITZGERALD,* JJ.

OPINION BY OLSON, J.:

Appellant, Danielle Dickson Gatlos, appeals from the judgment of sentence entered June 4, 2012, committing her to an aggregate sentence of eight to 23 months' incarceration followed by three years' probation for convictions of driving under the influence ("DUI") of alcohol or controlled substance,[1] aggravated assault by vehicle while DUI,[2] four counts of recklessly endangering another person,[3] possession of a

---

* Former Justice specially assigned to the Superior Court.

1. 75 Pa.C.S.A. § 3802.

2. 75 Pa.C.S.A. § 3735.1.

3. 18 Pa.C.S.A. § 2705.

small amount of a controlled substance (marijuana),[4] careless driving,[5] and reckless driving.[6] For the following reasons, we affirm.

The trial court set forth the relevant factual and procedural background of this matter as follows:

On Friday, March 12, 2010, at about 8:30 p.m., twenty-one year old Alejandro Bernard was driving north on Route 1 in Chester County from Oxford toward Kennett Square, Pennsylvania when [Appellant's] car, heading south on Route 1, struck another southbound car, then crossed the median and hit Mr. Bernard's vehicle on the side. [Appellant] and Mr. Bernard were each driving alone. There was a light rain and Mr. Bernard was driving 55 mph. He remained conscious and remembers that "the car ended up to the side to a dirt embankment, and then the medics got there and I got out of the car and I could not breathe." He got out of his vehicle but he could not walk. Mr. Bernard was taken by ambulance to a hospital in Christiana, Delaware, where he remained for three days. He had two broken ribs, a cut in his spleen and a cut on his arm. He went to therapy for about four months. At the preliminary hearing he was still not back to normal. He still feels pain. Four vehicles were involved in the crash and there were five or six officers at the scene.

Pennsylvania State Police Trooper Katherine Miller of Troop J, Avondale, had been employed by Troop J for four months at the time of the crash. She had to do the crash reports and investigation. Her job that night was to determine the injuries sustained by the people involved and try to figure out what

had happened. Because [Appellant] was nonresponsive and was being transported to a hospital, they needed to identify her right away. Trooper Miller and Trooper Martin went into [Appellant's] vehicle looking for her license. They also attempted to find her insurance information. The inside of her vehicle looked destroyed. The air bag had deployed and belongings were throughout the inside of the car. Neither item was in the glove compartment.

Trooper Martin found [Appellant's] purse inside the vehicle. Inside of the purse they found her driver's license. While looking in the purse for the license, they found an empty cigar box and a box of cigars that was missing one cigar. The purse was secured by the troopers to make sure [Appellant's] belongings were safe. They did not go through the other three vehicles because two of the drivers were on scene and able to provide identification and secure their vehicles. Mr. Bernard had called friends who arrived immediately, provided information and secured his vehicle. Trooper Scott Endey of the Pennsylvania State Police Troop J Avondale Barracks assisted Trooper Miller with the vehicle accident investigation. He was sent by Corporal Steven Ranck to Christiana Medical Center[, in Christiana, Delaware,] to interview two of the operators that were involved in the crash. He arrived at the hospital around 10:30 p.m. and interviewed both Mr. Bernard and [Appellant]. [Appellant] was in a hospital room, lying in bed, wearing a neck brace.

Trooper Endey told [Appellant] that he was a member of the state police and was there to ask her questions about the

---

4.  35 P.S. § 780–113(a)(31).

5.  75 Pa.C.S.A. § 3714.

6.  75 Pa.C.S.A. § 3736(a).

accident. He asked her if she was willing to answer questions. She replied yes, and said she was in the left lane, driving southbound on Route 1. As she passed a large vehicle she thought she was struck on the right side of her vehicle by the other vehicle and then recalled waking up in the hospital bed. He asked her if she had cigars in the car and she said yes. He asked what she was going to use them for and she said some of her friends smoke and she had them for her friends. She was planning to meet them later in the evening and they were going to smoke the cigars. He asked if the cigars were used for smoking tobacco or smoking marijuana, to which she did not reply. When asked if she had ever smoked marijuana, she replied yes, but it had been approximately three weeks earlier.

The trooper asked [Appellant] if she would voluntarily submit to a blood test. He told her she was not under arrest. At first she agreed and she and her mother looked over the paperwork for the voluntary consent. She then decided that she would not volunteer to a blood draw. Trooper Endey confirmed that [Appellant] would not voluntarily give a blood sample. [Appellant] was 19 or 20 years old. The trooper did not ask the hospital to draw blood for any purpose other than ordinary medical purposes. The hospital personnel told him that they would keep the records for 72 hours.

Brian Chew, owner and operator of Chew Towing in Oxford, Pennsylvania, responded to the crash scene on March 12, 2010. Trooper Miller ordered that [Appellant's] car and the other three vehicles be held at Chew's Towing. It

was protocol to hold [Appellant's] vehicle in case it was involved in a fatality, which concerned them because of Mr. Bernard's condition at the scene. He towed the four vehicles involved in the crash to his property in Oxford. The property has two buildings and a barrier around it with a gate. He secured [Appellant's] inoperable 2007 Ford Fusion behind the fenced gate. He said it was being stored there for the insurance company. Trooper Katherine Miller testified that she told him that she would come out to take pictures of all four vehicles and make sure she had all insurance information for all of the investigations.

Trooper Miller first testified that on the Monday after the accident she went to Chew's to take pictures of all vehicles and to get insurance information from all vehicles. She wanted to look for an insurance card in [Appellant's] vehicle. She said another driver had been calling asking for [Appellant's] insurance. She testified at the second hearing date that she was also looking for the registration card. Trooper Miller interviewed [Appellant] by telephone on March 13, or 14, 2010. At the time she did not ask her for her insurance information.[7] At that time she did not ask for her consent to search her car. She did not have [Appellant's] permission to search the vehicle for the insurance information.

Mr. Chew accompanied Trooper Miller to the vehicle. He testified that she told him she was there to look for an insurance card; she never told him she was there to do an inventory. He opened the door to assist her. It was not until she entered the vehicle and started looking for paperwork that Mr. Chew no-

7. Trooper Miller testified that she did not believe Trooper Endey asked [Appellant] for

insurance information at the hospital.

ticed something brown in shape which appeared to be a cigar on the passenger floor board. He noticed it as he stood outside the passenger door, which he had opened. He could have seen it through the window. When he saw the cigar he pointed it out to Trooper Miller and picked it up for her. Trooper Miller transported it back to the station where a field test tested positive for the presence of marijuana. It was then [sent] to Lima Lab. The lab test reflected, "The cigar butt . . . was found to contain marijuana . . . net weight of thirty-one hundredths (0.31) of a gram."

Trooper Miller called the hospital after visiting Chew's, spoke with someone in the lab, and asked if there were blood samples from [Appellant]. They said yes, it was standard. She told them she was attempting to get a search warrant and asked how long samples are held, to which they indicated 72 hours. She asked them to put [Appellant's] blood samples aside for her in order to obtain it through a search warrant. They agreed. She called back every day or so to make sure they still had the blood samples.

Trooper Miller prepared an application for a search warrant and signed it on March 16, 2010. She called the Chester County District Attorney's office and on-call Assistant District Attorney Donna Murphy approved the search warrant application. The search warrant application was never submitted to a magistrate or judge to determine whether probable cause existed.

Trooper Miller then called the Delaware State Police and asked for the protocol to obtain blood and medical records from Christiana Hospital. She was referred to the Attorney General's Office in Delaware. There, she spoke to a few different people and ultimately called the Delaware State Police again. They then gave her the name of Attorney General Karin Volker. She e-mailed Ms. Volker trying to obtain the proper paperwork to get the medical records and blood samples from the hospital. She forwarded to Ms. Volker a copy of the draft search warrant. After several communications with Ms. Volker, Trooper Miller received an e-mail or phone call from Robin Quillen with the Delaware Attorney General's office. Ms. Quillen explained that the paperwork was complete and asked her to meet her at the hospital on a specific day. It was about ten days after the crash. Ms. Quillen and Trooper Miller went to the hospital lab where Ms. Quillen gave the trooper the paperwork that was prepared by the Attorney General's office, which was a subpoena with the trooper's search warrant application attached to it. The paperwork was shown to the hospital personnel and they then turned over the blood samples. Trooper Miller left the hospital with custody of the blood. Thus, the medical records and blood were seized pursuant to a subpoena.

The blood samples were turned into evidence and sent to Drug Scan for testing. Dr. Richard Cohen's Drug Scan report reflects that the blood contained marijuana, 2.4 nanograms of Delta 9, THC which is a marijuana concentrate, per millimeter serum, and 61 nanograms THC which is a marijuana metabolite, milliliters per serum.

Robin Quillen, a detective with the Delaware Attorney General's office testified. She was asked by Deputy Attorney General Karen Volker, in March of 2010, to assist the Pennsylvania State Police in obtaining a blood sample from Christiana Hospital. Ms. Volker provided her with a subpoena and asked her to arrange with the Pennsylvania trooper to

meet at the hospital with the subpoena to transfer blood evidence over to the trooper. Attached to it was the application for search warrant from Pennsylvania. Detective Quillen confirmed that she and Trooper Miller met at the hospital, they hand delivered the subpoena to the woman in the lab and she brought them the requested sample on the same day.

Per a stipulation, Deputy Attorney General Karin Volker's testimony would be that she authorized the subpoena that was issued in this case that resulted in the obtaining of [Appellant's] blood. Further, she would testify that the subpoena was inappropriate under Delaware state law and that she should have approved a search warrant for the seizure of the blood. The Commonwealth stipulated that the subpoena was inappropriate for the seizure of everything; the blood and the medical records.

Corporal Steven Ranck, a patrol unit supervisor at Troop J Avondale testified. He had been a trooper for 15 years and previously a police officer for six years. He was offered by the Commonwealth, with no objection, as an expert in narcotics investigations.[8] [Corporal Ranck testified that, in his experience as a narcotics investigator, cigars and cigar wrappers are used for smoking marijuana.]

Corporal Ranck was the ranking trooper at the scene of the crash on March 12, 2010. [Appellant's] car had severe damage and was not drivable. [Appellant] was still in the vehicle and was unresponsive. She was taken away by ambulance. The vehicle was blocking traffic. He testified that the Pennsylvania State Police have a policy for removing vehicles from a crash scene. They have to inventory the vehicle. They look for any valuables to secure for the driver/owner in the event that they are not able to do it for themselves or unable to have somebody there to take care of it for them. Normal procedure when they have vehicles to be towed is to contact the nearest available tow company, which in this case was Chew's [T]owing. He testified that it is a written policy of the Pennsylvania State Police.

Before [Appellant's] vehicle was towed by Chew's Towing, Troopers Martin and Miller advised Corporal Ranck that they found cigars. There were two boxes, one was empty and one had one cigar missing. He recalls the empty box was a small [rectangular shaped] cigar box. Corporal Ranck told the other troopers that the cigars were significant. He considered it as an indicator which raised his suspicion: [Appellant] being relatively young, having cigars and the fact that they were in the vehicle. Trooper Miller took the cigars into custody.

A couple of days later Trooper Miller contacted him and brought him the cigar from the car at Chew's Towing: a small, one inch or so, part of a cigar, like the end of a cigar. When the Corporal saw it, the piece of cigar appeared to be a roach, from his training and experience. He could see that it had what appeared to be a little bit of marijuana in the end of it. Just by looking at it he believed

---

8. Corporal Ranck had been through the police academy where he learned basic drug investigation and identification. He has also been to numerous training classes on drug investigations and identification as an undercover drug investigator trooper for five years prior to his promotion in 2006. His experience included being lead investigator in several hundred drug cases and an assistant investigator in many more than several hundred cases. He had testified previously as an expert, once in the Court of Common Pleas and several times at District Court.

immediately that it was contraband. Because of its appearance he field tested it and it was positive for marijuana. Exhibit C–5 is the cigar, but it is torn up more and some of the wrapper has come off since he first saw it when it was just one piece, intact. He sent it to the lab where, in his experience, substances get distorted or change in appearance because of the examination and testing.

Trial Court Opinion, 11/23/2011, at 2–9 (footnotes in original).

Appellant was charged with the aforementioned crimes. Prior to trial, Appellant filed a motion to suppress evidence that Appellant believed the state police illegally seized. That motion addressed items seized in the search of Appellant's purse on March 12, 2010, the search of Appellant's vehicle on March 15, 2010, and all medical records, blood samples and toxicology reports received from Christiana Hospital on or about March 23, 2010. On April 19, 2011, the trial court held a suppression hearing. On November 23, 2011, the trial court entered an order denying all aspects of Appellant's motion to suppress.

On April 4, 2012, following the completion of a jury trial, Appellant was found guilty of DUI controlled substance, aggravated assault by vehicle while DUI, and four counts of recklessly endangering another person. The trial court then found Appellant guilty of the summary offenses of possession of a small amount of marijuana, careless driving, and reckless driving. The trial court sentenced Appellant on June 4, 2012. This timely appeal followed.[9]

Appellant presents two issues for appeal:

Whether the [t]rial [c]ourt erred and/or abused its discretion in failing to grant [Appellant's] motion to suppress?

Whether the trial court erred and/or abused its discretion in failing to grant [Appellant's] motion to preclude the trial testimony of Dr. Cohn?

Appellant's Brief at 2.

■ Appellant's first issue challenges the trial court's ruling on her motion to suppress. When reviewing the denial of a motion to suppress, we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. *Commonwealth v. Foglia*, 979 A.2d 357, 360 (Pa.Super.2009). We are bound by the suppression court's findings if they are supported by the record. *Id.* "Factual findings wholly lacking in evidence, however, may be rejected." *Commonwealth v. Dangle*, 700 A.2d 538, 539–540 (Pa.Super.1997), *citing Commonwealth v. Johnson*, 444 Pa.Super. 289, 663 A.2d 787, 789 (1995). We may only reverse the suppression court if the legal conclusions drawn from the findings are in error. *Foglia*, 979 A.2d at 360.

In this appeal, Appellant argues that the trial court erred in not suppressing three sets of evidence: (1) cigar boxes and their contents recovered from Appellant's purse (located in her vehicle) on March 12, 2010; (2) a cigar containing marijuana recovered from Appellant's vehicle on March 15, 2010, and the lab analysis thereof; and (3) Appellant's medical records and blood samples obtained from Christiana Hospital, located in the state of Delaware.

■ We begin by considering the legality of the search conducted on March 12,

9. The requirements of Pennsylvania Rule of Appellate Procedure 1925 have been satisfied in this matter.

2010. The certified record reflects that, on March 12, 2010, Appellant was involved in a motor vehicle accident that left her unresponsive and in need of immediate medical attention. Furthermore, unlike the other individuals involved in the accident, no one at the accident scene was able to identify Appellant. Because she was unresponsive and unknown, Trooper Martin searched Appellant's vehicle for her purse in an attempt to learn her identity. During that search, Trooper Martin found not only documents identifying Appellant, but also two cigar boxes, one of which was empty and one which had a single cigar missing. Trooper Martin placed Appellant's purse, including the two cigar boxes, into inventory for safekeeping. The cigar boxes and their contents were eventually entered into evidence.

On appeal, Appellant argues that the March 12, 2010 search of her vehicle and purse were illegal because the police did not have a warrant, did not have probable cause, and did not have Appellant's consent to conduct the search. Appellant's Brief at 17–19. On that basis, Appellant argues that the evidence discovered in the warrantless search should have been suppressed. *Id.*

The trial court denied Appellant's motion to suppress, holding that, because the motor vehicle accident rendered Appellant unresponsive, and because no one at the scene was able to identify her, exigent circumstances provided Trooper Martin with the legal justification to search Appellant's vehicle and purse for identification. Trial Court Opinion, 11/23/2011, at 10–11.

We conclude that, under the emergency circumstances in this matter, the state troopers lawfully entered Appellant's vehicle to learn her identity, and that within the lawful search for Appellant's identity, the troopers inadvertently discovered the cigar boxes. Consequently, we hold that

the trial court did not err in denying Appellant's motion to suppress the evidence discovered within the March 12, 2010 search.

■ Under well-accepted state and federal law, it is established that:

"The Fourth Amendment to the United States Constitution and Article 1, § 8 of the Pennsylvania Constitution require that searches be conducted pursuant to a warrant issued by a neutral and detached magistrate. A search conducted without a warrant is generally deemed to be unreasonable for constitutional purposes."

*Commonwealth v. Copeland,* 955 A.2d 396, 399 (Pa.Super.2008), *quoting Commonwealth v. Stewart,* 740 A.2d 712, 715 (Pa.Super.1999). Here, the trial court relied exclusively upon exigent circumstances to surmount the warrant requirement.

■ As the trial court correctly recognized, exigent medical circumstances that necessitate an immediate search to learn an individual's identity represent an exception to the warrant requirement. For example, in *Commonwealth v. Johnson,* 969 A.2d 565, 569 (Pa.Super.2009), our Court held that the need to identify an unconscious gunshot victim was an exigent circumstance, which, standing alone, justified the warrantless search of that victim's person.

In *Johnson,* the defendant had been the victim of a shooting and was taken to the hospital, unresponsive. *Id.* at 566–567. A police officer went to the emergency room to ascertain the victim's identity. *Id.* At that point, the victim was not suspected of having committed a crime. *Id.* at 567. Because no one at the hospital was able to identify the victim, police searched his clothing for identification. *Id.* Within that search, police recovered narcotics. *Id.*

The victim survived and was later charged with drug related offenses. *Id.* The victim (then defendant) moved to suppress the evidence obtained in the warrantless search of his clothing, and the trial court granted the motion. On appeal, our Court reversed holding:

a search at a hospital emergency room by a police officer of the clothing of a gunshot victim, who was not suspected of criminal wrongdoing, and such search having been conducted for the sole purpose of ascertaining the identity of the victim, is an exigent circumstance excusing the warrant requirement. The inadvertently discovered contraband is admissible.

*Id.* at 572.

In this matter, the trial court compared the facts and circumstances of the March 12, 2010 search of Appellant's vehicle and purse to those confronted by this Court in *Johnson,* and determined that those exigencies excused the warrant requirement for the search of Appellant's car and purse. Trial Court Opinion, 11/23/2011, at 10–11. Based upon this comparison, the trial court reasoned that, because Trooper Martin inadvertently discovered the cigar boxes and their contents while lawfully searching for Appellant's identity, the evidence was legally seized and therefore admissible. *Id.*

■ We disagree with the trial court's solitary reliance upon *Johnson* in this case. Significantly, *Johnson* did not involve a vehicle search, but addressed the search of one's person. Pennsylvania law is clear that warrantless vehicle searches require probable cause and exigent circumstances, beyond mere mobility of the vehicle. As our Court explained in *Commonwealth v. Brown,* 23 A.3d 544 (Pa.Super.2011):

Our Supreme Court has never recognized the federal automobile exception to permit a warrantless search of or seizure from a motor vehicle under Article I, Section 8 of the Pennsylvania Constitution.[10] Instead, in at least five cases, majorities of our Supreme Court have rejected the federal automobile exception in favor of what the plurality in [*Commonwealth v. McCree,* 592 Pa. 238, 924 A.2d 621 (2007) ] dubbed the "limited automobile exception." *Commonwealth v. Baker,* 518 Pa. 145, 541 A.2d 1381, 1383 (1988); *Commonwealth v. Rodriguez* [526 Pa. 268], 585 A.2d 988, 991 (Pa.1991); *Commonwealth v. White* [543 Pa. 45], 669 A.2d 896, 900 (Pa. 1995); *Commonwealth v. Luv* [557 Pa. 570], 735 A.2d 87, 93 (Pa.1999); *Commonwealth v. Hernandez* [594 Pa. 319], 935 A.2d 1275, 1280 (Pa.2007). Pursuant to the limited automobile exception, warrantless vehicle searches must be accompanied not only by probable cause, but also by exigent circumstances beyond mere mobility—"one without the other is insufficient." *Luv,* 735 A.2d at 93; *Hernandez,* 935 A.2d at 1280. The plurality in *McCree* emphasized that "[t]his dual requirement of probable

---

**10.** Article I, Section 8 of the Pennsylvania Constitution provides greater protection against unreasonable searches and seizures than is afforded by the Fourth Amendment to the United States Constitution. *See, e.g., Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991) (*quoting Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254, 1258 (1989)) ("Article I, Section 8 of the Pennsylvania Constitution ... may be employed to guard individual privacy rights against unrea-

sonable searches and seizures more zealously than the federal government does under the Constitution of the United States by serving as an independent source of supplemental rights."); *Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457, 468 (1983) ("Article I, [§] 8 ..., as consistently interpreted by [Pennsylvania courts], mandates greater recognition of the need for protection from illegal government conduct offensive to the right of privacy.").

cause plus exigency is an established part of our state constitutional jurisprudence." *McCree,* 924 A.2d at 629–630. *Id.* at 553 (parallel citations omitted, footnote in original).

In this matter, all parties acknowledge that Trooper Martin's search of Appellant's purse, located within Appellant's car, was not supported by probable cause. Hence, if we were to review this case as one that involved a search of a vehicle undertaken for investigative purposes, we would not hesitate to conclude that the intrusion into Appellant's car was unlawful because Trooper Martin's search was not supported by the dual requirement of probable cause and exigent circumstances. *Id.*

Though not relied upon by the trial court, within the proceedings on Appellant's motion to suppress, the parties also argued as to whether the March 12, 2010 search of Appellant's vehicle was a lawful warrantless inventory search. Our Supreme Court addressed the role and legal underpinnings of inventory searches under Pennsylvania law in *Commonwealth v. Nace,* 524 Pa. 323, 571 A.2d 1389 (1990). There, our Supreme Court explained:

> inventory searches are a well-defined exception to the warrant requirement of the Fourth Amendment and are a recognized part of our law:
>
> > ... it is reasonable for police to search the personal effects of a person under lawful arrest as part of the routine administrative procedure at a police station house incident to booking and jailing the suspect. The justification for such searches does not rest on probable cause, and hence the absence of a warrant is immaterial to the reasonableness of the search. Indeed, we have previously established that the inventory search constitutes a well-defined exception to the warrant

requirement. *See South Dakota v. Opperman,* [428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) ].

An inventory search is not designed to uncover criminal evidence. Rather, its purpose is to safeguard the seized items in order to benefit both the police and the defendant. We have recognized inventory searches in the two areas of automobiles and booking procedures. *See* [*Commonwealth v. Scott,* 469 Pa. 258, 365 A.2d 140, 144 (1976).]; *Commonwealth v. Daniels* [474 Pa. 173], 377 A.2d 1376 (Pa.1977).

Four goals underlie such searches. First, they protect the defendant's property while he is in custody; second, police are protected against theft claims when defendants are given their property upon release; third, they serve to protect the police from physical harm due to hidden weapons; and fourth, **when necessary they ascertain or verify the identity of the defendant.** Intrusions into impounded vehicles or personal effects taken as part of the booking process are reasonable where the purpose is to identify and protect the seized items.

As long as **the search is pursuant to the caretaking functions of the police department,** the conduct of the police will not be viewed as unreasonable under the Constitution. *See Scott,* 365 A.2d at 144.

*Nace,* 571 A.2d at 1391 (parallel citations omitted, emphasis added).

Furthermore,

[this] Court has observed that "two factors must be present in order to justify the reasonableness of an inventory search in the absence of probable cause. The Commonwealth must show: (i) that the vehicle in question was lawfully within the custody of the police, and (2)

that the search was in fact an inventory search pursuant to the objectives laid down in [*Opperman* ]" *Commonwealth v. Germann* [423 Pa.Super. 393], 621 A.2d 589, 594 (Pa.Super.1993), *citing Commonwealth v. Brandt* [244 Pa.Super. 154], 366 A.2d 1238 (Pa.Super.1976). The Court, in *Commonwealth v. Germann, supra,* observed further that " 'motive' is the sole factor which distinguishes a criminal investigatory search from a noncriminal inventory search of an automobile." *Id.* at 595, *citing United States v. Abbott,* 584 F.Supp. 442 (W.D.Pa.1984).

*Commonwealth v. Collazo,* 440 Pa.Super. 13, 654 A.2d 1174, 1177 (1995).

■ "If, after weighing all the facts and circumstances, the court is of the opinion that [a search] was an inventory search of an automobile lawfully in police custody, then any evidence seized as a result of this 'reasonable' inventory search is admissible." *Commonwealth v. Brandt,* 244 Pa.Super. 154, 366 A.2d 1238, 1242 (1976). Furthermore, as our Court explained in *Brandt,*

> [t]he term 'reasonable' inventory search like the term 'legal' contract is verbose. If the search is, in fact, an inventory search, it must be reasonable. For example, if while taking inventory of the contents of the car, the police remove the seats, rip open the upholstery and find contraband, the evidence must be suppressed—not because the inventory [search] was unreasonable but rather because it is apparent that the police were not conducting an inventory pursuant to the objectives laid down in *Opperman,* but were searching for incriminating evidence.

*Id.* at 1242 n. 7.

As set forth above, though addressed within the motion to suppress hearing, the trial court did not rely upon the inventory search exception to the warrant requirement to justify the March 12, 2010 search of Appellant's vehicle and purse. We however, believe that a lawful inventory search is, in fact, what occurred in this matter. Specifically, within this matter, we are called upon to decide whether the police need a warrant to enter and search a vehicle in order to locate identification materials for an unresponsive crash victim in need of immediate medical treatment. Based upon the certified record, it is undisputed that: (1) Appellant was alone in her vehicle; (2) the crash rendered Appellant unresponsive; (3) Appellant needed immediate medical assistance; (4) there was no way for first responders to reliably identify Appellant without undertaking a vehicle search; (5) time was of the essence; (6) Appellant's vehicle was inoperable; and (7) there was no way for officers to properly take custody of the vehicle, secure the scene, and remove wreckage without a vehicle search.

With regard to the two warrant exceptions set forth above, Pennsylvania law, as applied in *Johnson* and relied upon by the trial court, recognizes that exigent circumstances may provide an exception to the warrant requirement in what are essentially emergency situations created by those exigent circumstances. *Johnson,* however, did not involve a vehicle search. Our Supreme Court in *Nace* recognized that, in certain circumstances, an inventory search is necessary "to ascertain or identify the identity of a defendant," but *Nace* did not delve into the circumstances within which that exception is applicable. Indeed, we are surprised to realize that, based upon our research, Pennsylvania precedent has not addressed the circumstances necessary to conduct a warrantless search of a vehicle for the purpose of identifying an unresponsive crash victim. Other states, however, address this issue within the scope of

what they title the "emergency aid doctrine." We find their analysis of the emergency aid doctrine helpful and persuasive.

For example, in *State v. Rynhart*, 81 P.3d 814 (Utah App.2003), a police officer discovered a wrecked vehicle in a marsh. *Id.* at 815. The officer approached the vehicle and eventually entered it to try to find out the identity of the owner, the driver, and if anyone was in the vehicle at all. *Id.* The officer testified that he performed a very thorough search, opening all of the doors and looking under the seats. *Id.* at 816. Within that search, the officer found a partially full bottle of vodka in the console between the front seats, a briefcase, and a purse. *Id.* The officer searched the briefcase, and purse, wherein he found a wallet, which he also searched. *Id.* Within the purse and wallet, the officer found the defendant's driver's license, $329.00 in cash, several gift certificates, a small plastic bag containing a white powdery substance, and a mirror with some powder on it. *Id.*

After completing his search, the officer in *Rynhart* had the vehicle towed to a wrecking yard "for safe keeping," but did not officially impound the vehicle. *Id.* The officer retained the brief case and purse and the items that he found therein. *Id.* Eventually, the officer contacted the defendant, who admitted that the white powdery substance was cocaine, but claimed that it belonged to a friend. *Id.* The defendant was later charged with a number of drug-related crimes. *Id.*

Prior to trial, the defendant in *Rynhart* filed a motion to suppress the items seized during the warrantless search of her vehicle. *Id.* The trial court held that the officer's warrantless search of the vehicle was justified under Utah's emergency aid doctrine. *Id.* On appeal, the Utah Court of Appeals disagreed that the doctrine applied to the facts and circumstances of that case because the officer lacked reliable information that an emergency existed, rather than simply an abandoned vehicle. *Id.* at 819. In so holding, the court provided a thorough explanation of the doctrine and its application.

As the Utah court explained, the emergency aid doctrine, sometimes referred to as the medical emergency doctrine, is a variant of the exigent circumstances doctrine. *Id.* at 818. Under their application, the emergency aid doctrine will

> support a warrantless search of a person or personal effects when [a] person is found in an unconscious or semiconscious condition and the purpose of the search is to discover evidence of identification and other information that might enhance the prospect of administering appropriate medical assistance, and the rationale is that the need to protect life or avoid serious injury to another is paramount to the rights of privacy.

*Id., quoting Salt Lake City v. Davidson,* 994 P.2d 1283 (Utah App.2000).

Utah applies the following test for application of the emergency aid doctrine:

> [A] warrantless search is lawful under the emergency aid doctrine if the following requirements are met:
>
> (1) Police have an objectively reasonable basis to believe that an emergency exists and believe there is an immediate need for their assistance for the protection of life.
>
> (2) The search is not primarily motivated by intent to arrest and seize evidence.
>
> (3) There is some reasonable basis to associate the emergency with the area of place to be searched. That is, there must be a connection with the area to be searched and the emergency.

*Id.* The Utah court went on to explain that, under this test, whether an emergency

exists is fact intensive and the state has the burden to prove that the exigencies of the situation make the course imperative. *Id.* at 818–819. Furthermore, the Utah court cautioned that application of the emergency aid doctrine should be strictly circumscribed, because of the significant departure that it takes from Fourth Amendment jurisprudence, requiring neither a warrant nor probable cause as a prerequisite to a search. *Id.* at 819.

Comparing the emergency aid doctrine with Pennsylvania's definition of an inventory search, we note that the significant and common factor among both warrant exceptions is the absence of probable cause. *See Nace,* 571 A.2d at 1391; *Rynhart,* 81 P.3d at 818. Neither search is intended for investigative purposes, but is strictly limited to the caretaking function of the police. *Id.* Therefore, while we do not go so far as to adopt the "emergency aid doctrine" in Pennsylvania, as such an adoption would be unnecessary, we find its test and considerations helpful in setting forth parameters for the search contemplated by, but not addressed in *Nace*—a search "to ascertain or verify the identity of a defendant."

■■■■■ Consequently, we hold that pursuant to the situation eluded to in the Supreme Court's decision in *Nace,* under circumstances satisfying the three-part test set forth in *Rynhart,* and relied upon herein, police may conduct a warrantless inventory search of a vehicle for the purpose of identifying an unresponsive and otherwise un-identifiable crash victim.[11] Furthermore, applying the legal considerations of the emergency aid doctrine to the

facts and circumstances in this matter, we hold that the March 12, 2010 search of Appellant's vehicle and purse was a lawful inventory search, undertaken to ascertain Appellant's identity, motivated not by investigative efforts of police, but by the trooper's placement of the need to protect Appellant's life above Appellant's right to privacy.

Indeed, at the time of the search, Appellant was unconscious and in the process of being transported to the hospital. As a responding officer, Trooper Martin had an obligation to identify Appellant to assist medical personnel with her treatment, and to initiate bookkeeping responsibilities as the police took custody of her disabled vehicle. Therefore, unlike in *Rynhart,* in this matter it is beyond question that the troopers had an "objectively reasonable basis to believe that an emergency exist[ed] and believe there [was] an immediate need for their assistance for the protection of [Appellant's] life." *See Rynhart,* 81 P.3d at 818. The first element of the emergency aid doctrine is satisfied.

Additionally, absolutely nothing within the certified record indicates that the search of Appellant's vehicle was "motivated by intent to arrest and seize evidence." Indeed, testimony at the suppression hearing established that, at the time that troopers initiated the search of Appellant's vehicle and purse, they did not yet suspect her of having been under the influence while driving. They simply needed to figure out who she was. Therefore, the second prong of the test is satisfied.

---

11. *See also Broadnax v. State,* 666 S.W.2d 283 (Tex.App.1984) (holding that "emergency" exception to the warrant requirement applied where the defendant had been involved in an automobile accident, was only semiconscious and incoherent and unable to identify herself); *State v. Harnisch,* 114 Nev. 225, 954 P.2d 1180 (1998) (holding that exigent circumstances to validate a warrantless search of an automobile may include medical emergencies if police officers reasonably believe that the person on the premises is in need of immediate aid).

Finally, Appellant's purse was the most logical place to find her driver's license, and her driver's license was the most logical means to identify her. Consequently, "there [was] some reasonable basis to associate the emergency with the area or place ... searched." *Id.* The third prong of the emergency aid test is satisfied.

■ On this basis, we hold that the March 12, 2010 search of Appellant's vehicle and purse was a legal inventory search undertaken to ascertain Appellant's identity. Consequently, Appellant's argument that the search was illegal, as not supported by a warrant, probable cause, or consent, lacks merit. Furthermore, we hold that because the cigar boxes and their contents were discovered within a lawful inventory search, they were admissible evidence. *See Brandt,* 366 A.2d at 1242 (noting that evidence seized as a result of a lawful inventory search is admissible at trial.) ·

Though it is not exceptionally clear, it appears that at least one portion of Appellant's brief attempts to argue that, even if the March 12, 2010 search was a lawful inventory search (which we hold that it was), the evidence discovered within that search should be suppressed because the Commonwealth failed to present sufficient evidence that the inventory search was lawfully conducted. *See* Appellant's Brief at 19, *citing Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). We disagree.

■ Specifically, within *Wells,* the United States Supreme Court held that, where police had no standard procedure with respect to the opening of closed containers found during inventory searches, marijuana found in a closed suitcase was properly suppressed. *See Wells,* 495 U.S. at 4–5, 110 S.Ct. 1632. Our Court has interpreted the holding in *Wells* to require that an inventory search be conducted pursuant to reasonable police procedures, in good faith, and not as a substitute for a warrantless investigatory search. *See Commonwealth v. Hennigan,* 753 A.2d 245, 255 (Pa.Super.2000).

In this matter, Appellant argues that within the suppression hearing police did not present their policy regarding the opening of containers within an inventory search. Appellant's Brief at 19. Referencing the opening of Appellant's purse and the cigar boxes, Appellant relies upon the holdings in *Wells* and *Hennigan,* and argues that because "the" written policy on such inventory searches was not entered into evidence at trial, the Commonwealth failed to sustain its burden of proving that police conducted a lawful inventory search. *Id.* Therefore, Appellant asserts that the evidence discovered in the March 12, 2010 search should have been suppressed. *Id.*

■ Appellant, however, misinterprets the holding of *Wells* and *Hennigan,* and disregards testimony presented at the suppression hearing. Specifically, nothing within *Wells* and *Hennigan* requires the written policy for inventory searches to be presented to the court. Rather, those cases require evidence that the inventory search was conducted pursuant to standard police procedure, and in good faith. At the suppression hearing, Corporal Ranck testified that the Pennsylvania State Police have a policy for removing vehicles from a crash scene, and inventorying those vehicles to secure any valuables for the driver. He testified that it is a written policy of the Pennsylvania State Police. Furthermore, Trooper Miller testified that it is police procedure to attempt to identify accident victims, particularly when they are in need of immediate medical assistance.

Based upon this testimony, we hold that the Commonwealth presented sufficient evidence to address the concerns articulated in *Wells* and *Hennigan*. Indeed, the sum of the testimony in this matter establishes that the inventory search for Appellant's identity was conducted pursuant to standard police procedure, in a good faith attempt to identify Appellant, who was unconscious and in immediate need of medical assistance.[12] As a result, we affirm the trial court order denying Appellant's motion to suppress the evidence discovered within the March 12, 2010 search of Appellant's vehicle and purse.

We next consider Appellant's motion to suppress with regard to the March 15, 2010 search of her car. The record reflects that, after the accident, state police had Appellant's vehicle towed to Chew's Towing. Three days later, on March 15, 2010, Trooper Miller went to Chew's Towing to take photos of the vehicles and to ensure that she had complete insurance and registration information for each automobile. Mr. Chew, owner of the tow yard, accompanied Trooper Miller to Appellant's vehicle. While Trooper Miller searched Appellant's vehicle for insurance and registration information, Mr. Chew noticed the burnt cigar on the passenger floorboard. Mr. Chew pointed out and picked up the cigar for Trooper Miller. Trooper Miller transported the cigar to the police station, field tested it for marijuana, and seized the

item. The cigar was thereafter sent to a lab for further testing, which confirmed the presence of marijuana.

Appellant's motion to suppress alleged that the cigar tip recovered on March 15, 2010, and the lab analysis thereof, should be suppressed because the cigar was discovered as a result of a second illegal warrantless search of her vehicle. Appellant's Brief at 6–17.

■ The trial court acknowledged that, at the time of the discovery, the police had neither probable cause nor a warrant to search Appellant's vehicle. Trial Court Opinion, 11/23/2011, at 11–12. The trial court, however, denied Appellant's motion to suppress, finding that, because Appellant's car had been impounded, police would have inevitably discovered the cigar during a valid inventory search. Trial Court Opinion, 11/23/2011, at 11–12. Therefore, the trial court reasoned that the cigar was admissible under the inevitable discovery rule.[13] *Id.*

■ We disagree only slightly with the trial court's reasoning inasmuch as we hold that the March 15, 2010 search of Appellant's vehicle **was** a lawful inventory search of the vehicle. Therefore, although the trial court held that the burnt cigar **would have** inevitably been discovered pursuant to an inventory search, the more accurate legal conclusion is that the record

---

12. Furthermore, we note that there was no testimony presented at the suppression hearing verifying that the cigar boxes found within Appellant's purse were, in fact, opened. The only suppression testimony within the record regarding the opening of containers refers to Appellant's purse and wallet, which, for the reasons set forth above, were opened as part of a legal inventory search conducted in good faith and within police procedure.

13. With regard to the inevitable discovery rule, under Pennsylvania law:

> [i]f the prosecution can establish by a preponderance of the evidence that the illegally obtained evidence ultimately or inevitably would have been discovered by lawful means, the evidence is admissible. The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.

See *Commonwealth v. Bailey*, 986 A.2d 860, 862 (Pa.Super.2009), *quoting Commonwealth v. Gonzalez*, 979 A.2d 879, 890 (Pa.Super.2009).

reflects that the burnt cigar **was** discovered pursuant to an inventory search.

Indeed, the March 15, 2010 inventory search of Appellant's car was very similar to the inventory search conducted in *Collazo*. In that matter, police observed the defendant drive to a park, whereupon he exited his vehicle and engaged in a drug transaction. *See Collazo*, 654 A.2d at 1175. After witnessing the drug transaction, and through the help of a confidential informant, police surrounded and arrested the defendant. *Id.* After the defendant had been arrested, police seized his vehicle and transported it to an impound lot for storage. *Id.* When the defendant told police that he owned the vehicle, but had registered it in a different name, police contacted an employee of the impound lot, and asked him to check the vehicle's identification number. *Id.* When the employee was unable to read the identification number, he looked inside the vehicle for an owner's card or registration papers. *Id.* While doing so, he found a packet of heroin. *Id.* The employee of the impound lot informed police of his discovery, and they took possession of the evidence. *Id.*

On appeal, the defendant objected to the admission of the heroin found in his car, arguing that it had been seized as a result of an illegal warrantless search. *Id.* This Court ruled that Collazo's claim regarding the legality of the search was waived because he failed to raise it before trial. *Id.* at 1176. Despite this finding of waiver, the validity of the search was addressed on the merits. Therefore, though not binding, the merits discussion in *Collazo* is persuasive for our purposes.

With regard to that merits analysis, our Court found that the narcotics were discovered pursuant to a lawful inventory search. *Id.* at 1177. Significant to our determination was the fact that the vehicle had been lawfully seized and impounded

by police, and that the motive for the search of the vehicle was solely to identify its owner and not to uncover evidence of crime. *Id.* Considering those circumstances, the Court in *Collazo* held that the search "was within the caretaking function of the police and, as such, was properly conducted without a warrant." *Id.*

Similarly, in this matter the record is clear that following the March 12, 2010 accident, Appellant's vehicle was impounded at Chew's Towing. Furthermore, Trooper Miller testified that on March 15, 2010, she entered Appellant's vehicle, not to carry out a search for evidence, but for the limited purpose of obtaining insurance and registration information. This testimony is uncontroverted. Therefore, pursuant to the Supreme Court's explanation in *Nace*, the March 15, 2010 search of Appellant's vehicle was conducted within the caretaking function of police, and satisfies the definition of a lawful inventory search.

■ We note that in support of appeal, Appellant argues that her vehicle had not been "impounded" pursuant to 75 Pa. C.S.A. § 3352, which addresses when police are authorized to impound a vehicle, but was simply being "stored" on her behalf. Appellant's Brief at 14. In furtherance of this argument, Appellant relies upon testimony from Trooper Miller, wherein the trooper explained that it was her understanding that Appellant's vehicle was being "stored" not "impounded." *Id.*

■ Despite Trooper Miller's testimony, upon review of Section 3352, we find no error with the trial court's determination that Appellant's vehicle had been impounded and was therefore subject to an inventory search. *See* 75 Pa.C.S.A. § 3352 ("Any police officer may remove or cause to be removed ... any vehicle found upon a highway under any of the following cir-

cumstances: ... (2) The person or persons in charge of the vehicle are physically unable to provide for the custody or removal of the vehicle.") In this matter, the record is clear that, immediately following the accident, Appellant was unresponsive and in need of immediate medical attention. Additionally, Appellant's vehicle was badly damaged and not operable. Furthermore, it was police protocol to hold all vehicles involved in a fatal accident, and considering the state of some of the victims of the instant accident, police held the vehicles until it was determined whether all individuals involved would survive the accident. Therefore, all of the vehicles involved in the accident, including Appellant's, were towed to and stored at Chew's Towing. Police undertook all of these actions within their community care-taking function, as outlined in Section 3352. Appellant's opposition in this regard lacks merit. Consequently, we affirm the trial court's denial of Appellant's motion to suppress the partially burnt cigar and lab analysis thereof, but on different grounds than those relied upon by the trial court.[14]

In making our holdings with respect to both the March 12, 2010 and March 15, 2010 searches, we acknowledge that within its opinion denying Appellant's motion to suppress, the trial court found that, within the relevant time period for this matter, police did not conduct an inventory search. Trial Court Opinion, 11/23/2011, at 11. According to the trial court, "[t]he police were not at the official inventory stage yet." *Id.*

■■■■ We are, however, not bound by this legal determination and find the trial court's definition of what constitutes an inventory search too narrow for the facts of this matter and for Pennsylvania prece-

dent. Indeed, the trial court seems to qualify an inventory search as only that search conducted to literally inventory the contents of an automobile. While that is perhaps the primary function of an inventory search, within *Nace* our Supreme Court pointed out that, on occasion (such as in this matter), inventory searches are necessary to identify the identity of property or an individual such as an accident victim or criminal defendant. *See Nace,* 571 A.2d at 1391. Furthermore, Pennsylvania precedent unanimously agrees that the most important factor in evaluating such searches is the motive behind the search, and that the search is conducted pursuant to the objectives set forth by the United States Supreme Court in *Opperman. See Collazo,* 654 A.2d at 1177. In this matter, the evidence is uncontroverted that the vehicle searches that occurred on March 12 and 15, 2010 were conducted within the caretaking function of police and not in the pursuit of evidence. Consequently, we hold that the trial court's determination that an inventory search had not yet occurred in this matter is an error of law to which we are not bound.

Appellant's final issue with regard to her motion to suppress argues that the trial court should have suppressed Appellant's blood samples and test results obtained from Christiana Hospital in Delaware. Appellant's Brief at 19–24. According to Appellant, the police would not have known to ask for Appellant's blood samples and test results were it not for the illegal searches of Appellant's purse and vehicle, occurring on March 12, 2010 and March 15, 2010. *Id.* Therefore, Appellant argues that the blood samples and test results should have been suppressed as fruits of the poisonous tree. *Id.*

---

14. We may affirm the trial court's determination on any grounds, even where those grounds were not suggested to or known by the trial court. *See Commonwealth v. Colon,* 708 A.2d 1279, 1282, n. 1 (Pa.Super.1998).

■ Appellant is correct that the "fruit of the poisonous tree" doctrine generally requires exclusion of evidence obtained from, or acquired as a consequence of, illegal searches. *See Commonwealth v. Brown,* 700 A.2d 1310, 1318 (Pa.Super.1997). However, considering our holding above, finding that the March 15, 2010 search and seizure was legal, Appellant's argument is without merit. Indeed, for evidence to be fruit of the poisonous tree, that evidence must be discovered as a result of an illegal search. *Id.* The certified record establishes that the blood samples and test results were discovered as a result of the March 15, 2010 search, wherein police confirmed the use of marijuana. However, because that search was legal, the blood samples and test results were not fruits of the poisonous tree.[15] Appellant's argument in this regard lacks merit.

Therefore, in summary, we affirm the trial court's order denying Appellant's motion to suppress all three categories of evidence addressed in that motion: (1) the evidence discovered in the March 12, 2010 search of her vehicle and purse; (2) the evidence discovered as a result of the March 15, 2010 search of her vehicle; and (3) the medical records and blood samples obtained from Christiana Hospital.

■ Appellant's second issue on appeal argues that admission of expert testimony regarding her blood test results, without presenting testimony from the person who actually tested her blood, violated her Sixth Amendment right to confrontation. Appellant's Brief at 24–28. "Whether Appellant was denied [her] right to confront a witness under the confrontation clause of the Sixth Amendment is a question of law for which our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Yohe,* 39 A.3d 381, 384 (Pa.Super.2012),[16] *quoting Commonwealth v. Dyarman,* 33 A.3d 104, 106 (Pa.Super.2011).

Our Court recently addressed application of the confrontation clause, explaining that:

> [i]n *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause of the Sixth Amendment prohibits the use of testimonial hearsay obtained by police officers against a criminal defendant, even if such hearsay is reliable, unless the defendant has the opportunity to cross-examine the unavailable declarant. *Id.* at 54, 124 S.Ct. 1354. Later, in *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), the United States Supreme Court addressed the "class of testimonial statements

---

**15.** We note that in opposition to appeal, both the Commonwealth and the trial court address not only whether Appellant's blood samples and medical results were fruits of the poisonous tree, but also whether the evidence should have been suppressed because there was a procedural error in the method used to obtain the paperwork containing those results. Trial Court Opinion, 11/23/2011, at 14–15; Commonwealth's Brief at 28–32. Appellant, however, does not address this issue within her brief in support of appeal. Consequently, Appellant waived our consideration of the issue and we need not address it here.

**16.** We note that on August 28, 2012, our Supreme Court granted the petition for allowance of appeal in *Yohe. Commonwealth v. Yohe,* 211 MAL 2012 (Pa.2012). For unknown reasons, the Supreme Court's order granting that petition was not published within the Atlantic Reporter, preventing us from using an official site to the subsequent history. Regardless, the docket in *Yohe* appropriately notes that the petition was granted. Our Supreme Court has not yet issued a decision in that appeal. Therefore, as of the date of this opinion, this Court's decision in *Yohe* remains valid Pennsylvania law.

covered by the Confrontation Clause" delineated in *Crawford.* *Id.* at 2531. Such testimonial statements included "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits [ . . . ] that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.,* quoting *Crawford, supra* at 52, 124 S.Ct. 1354

In *Melendez–Diaz,* the defendant objected to the admission of certificates of analysis, describing results of forensic testing that determined certain seized substances to be cocaine. *Id.* [The defendant] maintained he had a constitutional right to confront the analysts, who should have been required to testify in person. *Id.* The Supreme Court determined that the certificates of analysis were affidavits made under circumstances leading a reasonable person to believe they would be used at trial. *Id.* at 2532. Accordingly, the affidavits were recognized as testimonial statements and the analysts who prepared the certificates were recognized as witnesses for the purposes of the Sixth Amendment, who the defendant had a right to confront. *Id.* Because that right was not afforded, the certificates were held to be inadmissible. *Id.* In *Melendez–Diaz* the prosecution offered no witnesses in support of the proffered certificates.

*Yohe,* 39 A.3d at 385 (parallel citations omitted).

In *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the United States Supreme Court applied its decision in *Melendez–Diaz,* and held that a laboratory report prepared for the defendant's drunken driving trial was testimonial in nature pursuant to the Sixth Amendment, and that the defendant's right to confrontation demanded that he have the right to cross-examine the analyst who prepared the report. *See Bullcoming,* 131 S.Ct. at 2713; *see also Commonwealth v. Barton–Martin,* 5 A.3d 363 (Pa.Super.2010), *appeal denied,* 612 Pa. 695, 30 A.3d 486 (2011) (same).

Citing *Bullcoming* and *Melendez–Diaz,* Appellant challenges the admission of the testimony of Dr. Richard Cohn, a forensic toxicologist, who offered expert opinion regarding the procedures that were used to test Appellant's blood and the results of those tests. Because Dr. Cohn did not physically test Appellant's blood, Appellant argues that admission of his testimony violated her Sixth Amendment right to confrontation as considered in *Bullcoming* and *Melendez–Diaz.* Appellant's Brief at 24–28.

Appellant, however, overlooks our Court's recent decision in *Yohe.* In *Yohe,* the defendant was charged with DUI, and the Commonwealth presented the testimony of toxicologist, Dr. Lee Blum to establish the results of the defendant's BAC test results. *Yohe,* 39 A.3d at 383. Dr. Blum testified that he authored the report of the analysis of the defendant's blood, but that he did not personally test the defendant's blood. *Id.* Indeed, the Commonwealth did not call the lab technician who physically performed the tests on the defendant's blood. *Id.* However, Dr. Blum testified that prior to authoring the report, he certified the test results submitted by the technician who performed the test. *Id.* at 387.

On appeal, the defendant in *Yohe* argued that, based upon precedent, including *Melendez–Diaz, Bullcoming* and *Barton–Martin,* the failure to present the analyst who physically performed the tests of his blood sample violated his Sixth Amend-

ment right to confrontation. Distinguishing the above precedent, *Yohe* held that:

> it is clear that Dr. Blum did not handle [the defendant's] blood sample, prepare portions for testing, place the prepared portions in the testing machines, or retrieve the portions after testing. However, it is equally clear that Dr. Blum did review the entire file, compare the results of the three independent test printouts on the three aliquots, certify the accuracy of the results, and sign the report. Accordingly, Dr. Blum is the analyst who prepared the certificate in anticipation for use at [the defendant's] trial. We concede that Dr. Blum is in a similar position as the testifying witnesses in *Barton–Martin* and *Bullcoming* in that he did not personally handle the defendant's blood sample, prepare the aliquots, or physically place the aliquots in the testing apparatuses. However, unlike the testifying witnesses in *Barton–Martin* and Bullcoming, Dr. Blum did certify the results of the testing and author the report sought to be admitted as evidence against [defendant]. We conclude this distinction is dispositive of the issue presented.
>
> As declared in *Bullcoming*, it is the certification and the written report that constitute the "testimonial statement" triggering the Sixth Amendment right of confrontation. *Bullcoming, supra* at 2713–2715. [The defendant] is not limited in his cross-examination of Dr. Blum as suggested by the trial court simply because there may be questions he cannot answer due to the fact he did not perform a specific task in the course of processing [defendant's] blood sample. What is relevant to [defendant's] right of confrontation is the basis for the findings in the report and the certification of those results. Dr. Blum, as the certifying analyst and signatory to the report, is the person who can respond to questions about the reasons for his certification and the bases for the factual assertions in the report. The fact that [the lab] chose not to have the individual who physically performed the testing certify the results and author the report may be an issue relevant to the weight of the certification, but it is not a confrontation issue. This is true so long as Dr. Blum's certification is based on a true analysis and not merely a parroting of a prior analysis supplied by another individual. *See id.* at 2713. Here Dr. Blum reviewed the raw data from the analysis machines, compared the three BAC results, and verified the correctness of the procedures as logged by the technicians. Based on his analysis of these materials, Dr. Blum certified the results as reflected in the report he signed.

*Yohe,* 39 A.3d at 389–390 (citations to the record and footnote omitted).

Based upon the above reasoning, our Court in *Yohe* held that the trial court erred in excluding the blood alcohol report of Dr. Blum on the basis of the defendant's Sixth Amendment right to confrontation. *Id.*

▮ Applying *Yohe* to this matter, we hold that the testimony of Dr. Cohn did not violate Appellant's Sixth Amendment right to confrontation. Indeed, similar to our analysis in *Yohe,* while Dr. Cohn did not perform the actual tests on Appellant's blood, he reviewed and analyzed the printouts from the various tests conducted by lab technicians. Upon completion of this review, Dr. Cohn authored the report with regard to Appellant's test results. Furthermore, Dr. Cohn responded to cross-examination regarding his certification and the basis for his conclusions. Consequently, Appellant's final issue on appeal is without merit.

Judgment of sentence affirmed.

FITZGERALD, J., files a Concurring Opinion.

CONCURRING OPINION BY
FITZGERALD, J.:

I join the majority's disposition of Appellant's suppression challenge to the blood samples and test results obtained from the Delaware hospital, as well as her claim concerning the trial testimony of Dr. Cohn. However, while I agree with the affirmance of the trial court's rulings with respect to the cigar boxes seized from Appellant's purse and the cigar seized from her car at the tow yard, I would do so on different bases. Accordingly, I respectfully concur.

First, with respect to the search of Appellant's vehicle, found inside her car on the night and at the scene of the accident, I would distinguish the search of her purse from the search of the cigar boxes. I incorporate the facts set forth by the majority, and further note the following suppression hearing testimony.[1]

Trooper Catherine Miller testified to the following. When asked "specifically why [she] and Trooper Martin went into [Appellant's] vehicle that night[,]" Trooper Miller responded that she was looking for Appellant's license,[2] because Appellant was being transported to the hospital and medical personnel needed to know her identity. N.T., 9/13/11, at 42. One of the troopers found Appellant's license inside her purse, which was inside the vehicle. They also observed, inside Appellant's purse, "a box missing one cigar." *Id.* at 44. With respect to the empty cigar box, Trooper Miller could not recall whether it was in Appellant's purse or in the vehicle. *Id.*

Corporal Steven Ranck testified to the following. "Before the vehicle was towed from the scene," Troopers Miller and Trooper Martin advised him that they found two branded[3] boxes of cigars in Appellant's car, one empty and one with one cigar missing, with two or three cigars still in the box. *Id.* at 11–12. Corporal Ranck told the troopers that Appellant's "young age" and the cigar boxes' presence in the vehicle was "an indicator" that "raise[d his] suspicion" that cigars may have been used to ingest marijuana. *Id.* at 17–18. Trooper Miller then "took the cigars into **custody.**" *Id.* at 18 (emphasis added).

On cross-examination, Corporal Ranck reiterated that he "had a suspicion" of drug use when Trooper Miller showed him the two cigar boxes, and that the boxes were "taken." *Id.* at 22, 33. When asked whether the police policy provided a time period in which an inventory search should or must be conducted, the corporal testified that he did not "believe there is a time limit … off the top of [his] head." *Id.* at 37. However, Corporal Ranck cited an example: if an individual is arrested for DUI and will be taken into custody prior to towing the vehicle, the police "would be doing an inventory search in [the] vehicle" because at the time the tow truck operator takes the vehicle, it is no longer in police custody. *Id.* at 38.

At the suppression hearing, the Commonwealth cited section 3352 of the Pennsylvania Motor Vehicle Code as providing "any police agency the right to remove a vehicle from a scene under certain circumstances," including a crash blocking the

---

1. The court held two suppression hearings, on April 19 and September 13, 2011.

2. Trooper Miller could not recall whether it was she or Trooper Martin who found Appellant's license. N.T. at 43.

3. Corporal Ranck testified that he believed the boxes had the "Philly Blunts" brand on them. *Id.* at 12.

road.[4] *Id.* at 39. The Commonwealth specifically stated that "when a police officer conducts an inventory search, the Commonwealth must demonstrate that the police intrusion into the vehicle was for the purpose of taking inventory of the vehicle **and not for gathering incriminating evidence.**" *Id.* at 39–40 (emphasis added).

I agree with the majority that the initial entry into Appellant's vehicle, the limited search for her identification, and the seizure of her license from her purse were reasonable under an extension of the rationale in *Commonwealth v. Johnson,* 969 A.2d 565 (Pa.Super.2009)[5] and Utah's "emergency aid doctrine."[6] I would, however, avoid entwining an inventory search analysis. I emphasize that Trooper Miller's stated purpose for her and Trooper Martin's entry into Appellant's vehicle was to search for documentation of Appellant's identification; she did not state that they were also conducting inventory of the car at that time. Furthermore, Corporal Ranck, who had articulated his suspicion of Appellant's drug use to the troopers, did not testify explicitly whether the cigar boxes were "taken" into "custody" as a part of the inventory policy or as evidence of drug use. *See id.* at 18, 33. Accordingly, although someone may have already called the towing company and it may have even arrived on scene, I would not consider the troopers' entry into the vehicle an inventory search.

With respect to the seizure of the cigar boxes, I again incorporate the facts set forth by the majority, and further note the following. Trooper Miller did not explain whether she or Trooper Martin had opened or otherwise manipulated the cigar boxes in order to conclude one was empty and one was missing one cigar. A search inside these boxes may not have been proper for determining Appellant's identification, as a cigar box would not be a usual place to store one's driver's license or identification. Furthermore, Trooper Miller did not testify as to which item in Appellant's purse was found first—her license or the cigar box with one missing cigar. If the officers found Appellant's license first, then there would have been no need to search further. In light of the foregoing, I do not agree that the evidence established that the cigar boxes, specifically the contents of the boxes, were "inadvertently" discovered.

Nevertheless, I would hold simply that the cigar boxes and their contents would

---

**4.** *See* 75 Pa.C.S. ¶ 3352(b) ("Any police officer may remove or cause to be removed to a place of safety any unattended vehicle illegally left standing upon any highway ... in such position or under such circumstances as to interfere unduly with the normal movement of traffic or constitute a safety hazard.").

The Commonwealth also cited *Commonwealth v. Hennigan,* 753 A.2d 245 (Pa.Super.2000), for authority that the police may "conduct an inventory search to protect the rights of the property owner from any loss [by] a road tow truck operator[,] someone on the street or ... anyone else." N.T. at 39.

**5.** I agree with the majority that the facts and holding of *Johnson* were limited to a search of the defendant's clothing, and did not involve a search of a vehicle. *See Johnson,* 969 A.2d at 566 ("We find that the need to identify an unconscious victim, in order to facilitate investigation of the attack, can be an exigent circumstance justifying a warrantless search of the victim's clothing. We specifically hold that the instant, warrantless search was justified when the police had no reason to believe that Appellee had committed a crime.").

**6.** I agree with the majority that the trial court's sole reliance on the exigent circumstances doctrine was improper, as both parties agreed that there was no probable cause to search Appellant's purse. *See Commonwealth v. Brown,* 23 A.3d 544, 553 (Pa.Super.2011) ("Pursuant to the limited automobile exception, warrantless vehicle searches must be accompanied not only by probable cause, but also by exigent circumstances beyond mere mobility—'one without the other is insufficient.'").

have been inevitably discovered during an inventory search pursuant to 75 Pa.C.S. ¶ 3352(b), conducted as a result of Appellant's inability to take the car and the car's obstruction of traffic. *See Commonwealth v. Bailey*, 986 A.2d 860, 862 (Pa.Super.2009) (stating evidence is admissible if prosecution can establish by preponderance of evidence that illegally obtained evidence ultimately or inevitably would have been discovered by lawful means).

Second, I would affirm the court's denial of suppression of the cigar found in Appellant's car at the tow yard, on the basis employed by the trial court. The majority cites Trooper Miller's stated purpose of entering the vehicle to obtain insurance and registration information and then holds that she was conducting an inventory search. I would hold that her intention—searching for insurance and registration information—was simply not related to the goals of an inventory search. *See Commonwealth v. Nace*, 524 Pa. 323, 571 A.2d 1389, 1391 (1990) (stating four goals underlie inventory searches: (1) protection of defendant's property while he is in custody; (2) protection of police against theft claims when defendant is given his property upon release; (3) protection of police from physical harm due to hidden weapons; and (4) when necessary, the establishment or verification of defendant's identity[7]). Furthermore, I would disagree with the premise implicit in the majority's reasoning—that inventory searches were conducted at the scene of the crime and again at the tow yard. Nevertheless, as stated above, I would affirm the court's denial of suppression based on its reasoning that the cigar would have been inevitably discovered in a proper inventory search. *See Bailey*, 986 A.2d at 862.

7. By the time Trooper Miller conducted this search at the tow yard, Appellant's identity

For the foregoing reasons, I respectfully concur with the majority's disposition.