J-A14042-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LUIS T. GARCIA | : | |
| | : | |
| Appellant | : | No. 877 EDA 2023 |

Appeal from the Judgment of Sentence Entered March 9, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003846-2021

BEFORE: LAZARUS, P.J., STABILE, J., and LANE, J.

MEMORANDUM BY LANE, J.: **FILED OCTOBER 30, 2024**

Luis T. Garcia ("Garcia") appeals from the judgment of sentence imposed following his convictions for first-degree murder, carrying a firearm without a license, carrying a firearm in public in Philadelphia, and possession of an instrument of crime.[1] We affirm.

The trial court summarized the underlying facts as follows:

In 2020, [Garcia learned] that the mother of his child had a relationship with [David Sanchez.] According to [Garcia,] he became frustrated when [Sanchez] began texting him about the relationship. During December 2020, [Garcia's] car was shot multiple times just after he left the vehicle. [Garcia] later heard that [Sanchez] and a "crew" he belonged to, called "4200," were responsible for the shooting.

On the night of January 4, 2011, [Garcia] went to a [restaurant] on the 4200 block of North 6th Street [in Philadelphia] looking for someone associated with [Sanchez] and his crew. While [Garcia] was in the [restaurant], the [minor

_____

[1] **See** 18 Pa.C.S.A. §§ 2502, 6106(a)(1), 6108, 907(a).

victim, J.C. ("the Victim"),] passed by on his bicycle. [Garcia] believed [the Victim] was associated with [Sanchez] and the 4200 crew and began to follow [him on foot].

. . . According to [Garcia, the Victim], still on his bike, turned around on North Fairhill Street and headed toward [Garcia. Garcia] shot [the Victim] eight times [and fled on foot.] On North Reese Street, a car pulled up and [Garcia] got into the passenger's seat.

Trial Court Opinion, 7/10/23, at 3-4 (record citations omitted). The Victim died as a result of this shooting. Police officers recovered eight nine-millimeter cartridge casings from the scene.

Police detectives obtained surveillance video footage from local businesses which depicted the shooter before, during, and after the shooting. In particular, surveillance video obtained from the restaurant showed a man inside the store wearing black clothing, gloves, and black sneakers with reflectors on the front, and carrying a black fanny pack across his shoulder. However, the man wore a mask and his face was not visible. *See* N.T. Suppression Hearing, 7/29/22, at 33. Another video showed the same man shoot the Victim. Additional video showed the shooter running on foot and entering a black Subaru with dark tinted windows, trunk spoiler, hood vent, shiny wheels, sunroof, and a white decal on the rear window ("the Subaru"). Detectives were able to track the car's path of travel until it was near the intersection of Sixth and West Sedgley Streets. Detectives could not, however, see the vehicle's license plate number.

The Victim's family informed police officers they heard the shooter lived near 6th and West Sedgley Streets. On January 11, 2022, seven days after the shooting, Philadelphia Police Detective Vincent Parker and his partner were on foot in that area attempting to obtain additional surveillance video. They observed a black Subaru four-door sedan on the 600 block of West Sedgely Street, which had the same features as the vehicle in the surveillance video: dark tinted windows, hood vent, shiny wheels, sunroof, trunk spoiler, and a white emblem on the lower left side of the rear window. As the detectives entered their unmarked vehicle, however, they lost sight of the Subaru. The detectives drove around the area and approximately one hour later and saw the Subaru in their rearview mirror. *See id*. at 72-73. They called for uniformed patrol officers, who effectuated a stop of the Subaru. Officers took took both occupants into custody — Garcia, the passenger, and Eric Santiago ("Santiago"), the driver — and transported them to the police department for questioning. Furthermore, the officers observed that Garcia was wearing black sneakers with reflectors on the front, resembling those worn by the suspect in the surveillance video. The officers seized Garcia's sneakers, as well as his red iPhone.

That same day, Philadelphia Police Detective Joseph Knoll interviewed Garcia, without initially providing a *Miranda*[2] warning. Garcia provided

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

biographical information, including his address — which was also his girlfriend's house — and his girlfriend's name and phone number. However, Garcia refused to "unlock" his iPhone or disclose his phone number. N.T., 8/18/22, at 19-20. At the same time, officers executed a search warrant on the Subaru, where they recovered a fanny pack containing a handgun and Garcia's driver's license.[3] Upon receipt of this information, during the same interview, Garcia was arrested for possession of the firearm and Detective Knoll advised him of his *Miranda* rights. Thereafter, Detective Knoll asked Garcia questions about the murder of the Victim the previous week. *See id*. at 38. Defense counsel argued these questions were intended to elicit inculpatory information about the murder, while Detective Knoll stated Garcia could have merely been a witness to the murder or could have provided information about who was in the Subaru. *See id*. at 16, 44. Garcia denied involvement and his responses to Detective Knoll's questions were exculpatory. *See id*. at 48.

Based on the contact information given by Garcia, detectives spoke with his girlfriend, who then provided his telephone number. Detectives also obtained from the probation department a second phone number attributed to Garcia. *See id*. at 21-22. At this juncture, we note Garcia changed his phone number two days after the murder. *See* Trial Court Opinion, 7/10/23,

---

[3] Additionally, officers found a second handgun under the driver's seat. *See* N.T., 7/29/22, at 51.

at 20. Police detectives thereafter obtained search warrants for: (1) Garcia's girlfriend's house; (2) the contents of his red iPhone; (3) cellphone records for the two phone numbers associated with Garcia; and (4) his DNA. During the search of Garcia's cellphone, police recovered a photograph of the Victim, photographs of Garcia with firearms, and a video of him and other men with firearms referring to themselves as the "4200 killers."

Detectives obtained an arrest warrant for Garcia for the murder. He had been detained since the vehicle stop and submitted to a second interview on January 21, 2021, this time with Detective Parker. Detective Parker informed Garcia he was arresting him for the murder of the Victim, would question him about the murder, and advised him of his *Miranda* rights. N.T., 8/18/22, at 80. Garcia then confessed to the murder. Both the January 11, 2021 and January 21, 2021 interviews were videotaped.

Garcia filed a motion to suppress the statements he gave in both interviews, as well as all the physical evidence obtained through the search warrants. Garcia also filed a *Franks*[4] motion, arguing the Commonwealth intentionally omitted salient information from the affidavits of probable cause for the search warrants. Pertinently, Garcia claimed that Santiago told police: he drove Michael Mercado, known as "C-Mo," to the area of the shooting on the night of the murder and dropped him off for a drug transaction; Santiago

---

[4] *See Franks v. Delaware*, 438 U.S. 154 (1978) (discussed *infra*).

drove around the neighborhood; and Santiago picked up C-Mo after C-Mo called him sounding "hyped up." N.T., 9/23/22, at 6-7. However, Garcia averred, in the affidavit of probable cause, the Commonwealth replaced these references to "C-Mo" with the phrase "unknown male," implying that person was Garcia. The trial court conducted three hearings and ultimately: (1) granted suppression of the statements Garcia gave at the first interview **before** the **Miranda** warning; (2) denied suppression of Garcia's statements given at the same interview **after** the **Miranda** warning; and (3) denied relief on his remaining suppression claims, including his **Franks** motion.

The Commonwealth charged Garcia with first-degree murder and firearms offenses. The charges proceeded to a jury trial, where Garcia did not testify or call witnesses. Relevant to Garcia's issues on appeal, we note Garcia proposed jury *voir dire* questions related to the issue of improperly obtained confessions, but the trial court rejected them. Additionally, the trial court admitted a photograph, over Garcia's objection, taken three days after the murder and depicting him holding a firearm. **See** N.T., 3/8/23, at 13, 128. Finally, Garcia requested a jury instruction on missing evidence, as the Commonwealth could not produce the video of Santiago's first interview with detectives. **Id**. at 179-80. The trial court denied this request.

The jury found Garcia guilty of first-degree murder, carrying a firearm without a license, carrying a firearm in public in Philadelphia, and possession of an instrument of crime. Immediately thereafter, the trial court sentenced

Garcia to a term of mandatory life imprisonment without parole and a consecutive, aggregate term of four and one-half years to twelve years' imprisonment. Garcia did not file a post-sentence motion, but filed a timely notice of appeal. Both he and the trial court complied with Pa.R.A.P. 1925.

Garcia raises the following issues for our review:

[1.]   Whether the trial court erred as a matter of law and abused its discretion in denying [Garcia's] motion to suppress [his] warrantless arrest and seizure by law enforcement as they lacked probable cause to seize [him], a passenger in a car[,] and confiscate his shoes?

[2.]   Whether the trial court erred as a matter of law and abused its discretion in denying [Garcia's] motion to suppress his statements where detectives violated [his] Sixth Amendment and **Miranda** rights by obtaining a confession using suppressed evidence, failing to specify the crime in question, and speaking with [him] without counsel present?

[3.]   Whether the trial court erred as a matter of law and abused its discretion in denying [Garcia's] motion to suppress search warrants that lacked probable cause for: (1) a red iPhone; (2) phone records; (3) [Garcia and his girlfriend's house]; (4) a DNA sample from [Garcia]; and (5) a Subaru Legacy . . . ?

[4.]   Whether the trial court erred as a matter of law and abused its discretion in denying [Garcia's] **Franks** motion which had challenged the search warrant affidavit where the detectives purposely omitted the name ([C-Mo]) as [this] name would have negated any finding of probable cause to search [Garcia's] phone and phone records?

[5.]   Whether the trial court erred as a matter of law and abused its discretion in denying [Garcia's] request for *voir dire* when the questions were relevant to prospective jurors after detectives had improperly obtained [Garcia's] confession?

[6.]   Whether the trial court erred as a matter of law and abused its discretion in admitting photographs, taken days after the

alleged shooting, in which [Garcia] was holding a gun that was not alleged to be the murder weapon?

[7.] Whether the trial court erred as a matter of law and abused its discretion in denying [Garcia's] jury charge request for a "missing evidence instruction" for . . . Santiago's January 11, 2021 interview which the Commonwealth lost without explanation while in its possession?

Garcia's Brief at viii-ix (issues reordered and unnecessary capitalization and citations omitted).

Garcia's first four issues relate to the trial court's denial of his motions to suppress evidence. This Court has stated:

Our standard of review in suppression matters is well[-]settled. We must determine whether the factual findings of the suppression court are supported by the record, and if there is support in the record, we are bound by the facts and may reverse only if the suppression court's legal conclusions from the facts are in error. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing.

*Commonwealth v. Goldman*, 252 A.3d 668, 677 (Pa Super. 2021) (citations and quotation marks omitted). The Commonwealth bears the burden of establishing by a preponderance of the evidence that the challenged evidence was not obtained in violation of the defendant's rights. *Commonwealth v. Smith*, 285 A.3d 328, 332 (Pa. Super. 2022) (citation omitted).

In his first issue, Garcia claims that the trial court erred in denying his motion to suppress his warrantless arrest and the seizure his sneakers. For

- 8 -

ease of discussion, we address these two issues separately. First, with respect to a warrantless arrest, we note:

> To be lawful, an arrest must be supported by probable cause to believe that a crime has been committed by the person who is to be arrested. A police officer must make a common sense decision whether there is a fair probability that a crime was committed by the suspect. Whether probable cause exists is a highly fact-sensitive inquiry that must be based on the totality of the circumstances as viewed through the eyes of a prudent, reasonable, cautious police officer guided by experience and training. Probable cause does not involve certainties, but rather the factual and practical considerations of everyday life on which reasonable and prudent human beings act.
>
> It is only the probability and not a *prima facie* showing of criminal activity that is a standard of probable cause.

**Goldman**, 252 A.3d at 677-78 (citations and quotation marks omitted).

Garcia asserts the trial court abused its discretion and erred as a matter of law in denying his motion to suppress his warrantless arrest. Garcia maintains the police officers lacked probable cause to seize him from the Subaru. Garcia concedes Detective Parker may have had reasonable suspicion to stop the Subaru when he first observed it, but asserts that after he lost sight of vehicle and viewed it later in his rear view mirror, the detective could not have seen the features on the back or side of the vehicle. Garcia further alleges that none of the features of the car observed in the surveillance video — dark tinted windows, a trunk spoiler, sunroof, hood vent, shiny wheels, and a decal on the rear window — were in fact "unique." Garcia's Brief at 6.

The trial court found the warrantless arrest of Garcia was supported by probable cause. The trial court reiterated the evidence of several surveillance videos showed the same person: (1) shooting toward the area where police later found the Victim; (2) fleeing southbound on foot; and (3) "entering a black Subaru with dark tinted windows, trunk spoiler, sunroof, hood vent[], shiny wheels, and a white back window decal." Trial Court Opinion, 7/10/23, at 6. The surveillance videos showed the Subaru's path of travel, until it was last seen near the intersection of 6th and West Sedgley Streets. *Id*.

The trial court first found the vehicle stop was lawful:

> Detective Parker stated that the [Victim's] family . . . reported . . . they had heard the person responsible for the murder lived in the area of [Sixth] and West Sedgley Streets. About one week after the murder, detectives attempted to recover more video from [that] area and, when doing so, encountered a vehicle matching the vehicle depicted on the video. Detective Parker testified that he believed the car was the same car . . . based on the hood vent, color, and proximity to where detectives lost track of the car on surveillance video. Detectives then called uniformed police officers to effectuate a stop.

*Id*. The trial court concluded that "[b]ased upon the totality of the circumstances and viewed through the eyes of a trained police officer," the foregoing evidence "established that police had reasonable suspicion that the individuals in the black Subaru may have been involved in the murder." *Id*. at 7.

The trial court then found the warrantless arrest of Garcia was supported by probable cause. It reasoned:

Here, video surveillance showed that the person . . . who appeared to commit the murder was wearing sneakers with distinctive reflective material on them. [During the vehicle stop,] which occurred only a week after the murder, once [Garcia] stepped out of the car, [Detective Parker] noticed [he] was wearing sneakers that looked like the ones worn by the suspect in the video. . . .

*Id*. at 7-8. The trial court concluded this evidence, together with the above relating to the Subaru, established probable cause for the officers to believe Garcia had committed a crime. *See id*. at 8. The court found:

Here, [Garcia] was stopped in a car matching the description of the getaway car in the same area that the car was last seen on video surveillance. Furthermore, this was the same neighborhood that police, based upon information provided by the decedent's family, believed the suspect lived. Once the car was stopped, police observed that [Garcia] was also wearing distinctive sneakers that matched the sneakers the suspect wore on video surveillance. Thus, based upon the totality of the circumstances, there was probable cause to believe that [Garcia] had committed a crime.

*Id*. at 6-9 (unnecessary capitalization and citations omitted).

Based on our review, we conclude the trial court's factual findings are supported by the record and its legal conclusions are free from error. Although Garcia challenged the validity of the vehicle stop before the trial court, he raises no such issue on appeal. His present arguments, that the Subaru's features were not unique and that Detective Parker could not have observed those features in his rear view mirror, concern the weight of the evidence. The trial court specifically credited Detective Parker's suppression hearing testimony, and we may not disturb this finding. *See Goldman*, 252 A.3d at 677; *see also* N.T., 9/23/22, at 96-97. We conclude the record supports the

- 11 -

trial court's finding that Detective Parker had probable cause to detain Garcia without an arrest warrant.

Next, Garcia alleges the trial court erred in applying the plain view doctrine and denying his motion to suppress his sneakers. Preliminarily, we note that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). "'[I]ssues, even those of constitutional dimension, are waived if not raised in the trial court[,]' and . . . a 'new and different theory of relief may not be successfully advanced for the first time on appeal.'" **Commonwealth v. Jefferson**, 256 A.3d 1242, 1252 (Pa. Super. 2021) (*en banc*) (citation omitted).

Garcia's motion to suppress physical evidence stated, without further discussion, that "his shoes generically resembled those worn by the shooter." Motion to Suppress Physical Evidence, 5/9/22, at unnumbered 1-2. The motion then vaguely averred the search and seizure of his "person and property" was illegal, while making no further reference to his sneakers. **Id**. at unnumbered 3. At the first suppression hearing, defense counsel stated he was "seeking to suppress [Garcia's] shoes," but provided no argument specific to the shoes. N.T., 7/29/22, at 23, 24. Nevertheless, the trial court ruled that the officers properly seized his sneakers under the plain view doctrine. **See id**. at 99.

Garcia now argues, for the first time on appeal, that: (1) the trial court erred in applying the plain view doctrine; (2) "reflective sneakers are not

- 12 -

distinctive [and thus] their 'incriminating nature' cannot be 'immediately apparent;'" and (3) "the video footage of the suspect was in black and white and from a distance," and its depiction of his shoes was "not distinct enough." Garcia's Brief at 8-9. Because Garcia did not present these arguments before the trial court, he has waived them for our review. *See* Pa.R.A.P. 302(a); *see also* Pa.R.A.P. 2117(c)(1), 2119(e) (requiring appellant's statement of the case and argument to specify the place in the record where issue was raised before the trial court); *Jefferson*, 256 A.3d at 1252.

Moreover, even if Garcia had not waived his issues, we would determine no relief is due. While warrantless searches and seizures are presumptively unreasonable,

> [t]he plain view doctrine allows the admission of evidence seized without a warrant when: (1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object.

> "There can be no reasonable expectation of privacy in an object that is in plain view." . . .

> In determining whether the incriminating nature of an object is immediately apparent to the police officer, we look to the totality of the circumstances. [The officer's] belief must be supported by probable cause.

*Smith*, 285 A.3d at 332-33 (citations omitted).

In applying the plain view doctrine to Garcia's sneakers, the trial court reiterated that surveillance video showed the suspect wore "sneakers with distinctive reflective material." Trial Court Opinion, 7/10/23, at 7. The trial

- 13 -

court found that during the vehicle stop, the police officers observed Garcia's "sneakers from a lawful position, outside the vehicle on a public street, and observed that the distinctive sneakers appeared to match the sneakers worn by the suspect in the video." *Id*.

Based on our review, we would conclude the trial court's factual findings are supported by the record and its legal conclusions are free from error. Garcia's arguments, that the surveillance videos were not clear and that reflective features on sneakers are not in fact unique, concern the weight of the evidence. As stated above, we may not disturb the trial court's findings as to weight. *See Goldman*, 252 A.3d at 677. Furthermore, Garcia makes no claim that he had a reasonable expectation of privacy in his sneakers, which were in plain view following the officers' lawful stop of the vehicle. *See Smith*, 285 A.3d at 332. Accordingly, we determine the record supports the trial court's denial of suppression of the sneakers. No relief is warranted on Garcia's first issue.

In Garcia's second issue, he claims the trial court's denial of his motion to suppress his statements at both police interviews was an error and abuse of discretion. Pursuant to *Miranda*, "[t]he prosecution may not use statements stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel." *Commonwealth v. Lukach*, 195 A.3d 176, 184-85 (Pa. 2018) (citation omitted).

A defendant may waive his ***Miranda*** rights[] and agree to answer questions or make a statement.  For a waiver to be valid, it must be knowing, voluntary, and intelligent.  In other words, the waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

***Commonwealth v. DeJesus***, 787 A.2d 394, 402 (Pa. 2001) (citations omitted).

[A] valid waiver of ***Miranda*** rights requires that the suspect have an awareness of the general nature of the transaction giving rise to the investigation.  The rationale [is] that it is only when such knowledge is possessed by a suspect that he can be said to understand the consequences of yielding the right to counsel. [H]owever, . . . the suspect need not have knowledge of the "technicalities" of the criminal offense involved; rather, it is necessary only that he be aware of the "transaction" involved.

***Commonwealth v. Carr***, 580 A.2d 1362, 1365 (Pa. Super. 1990) (citations omitted).

A waiver of ***Miranda*** warnings also serves to waive one's Sixth Amendment right to counsel.  ***See Commonwealth v. Rawls***, 256 A.3d 1226, 1234 (Pa. 2021).  The Sixth Amendment right to counsel "is offense specific [and] cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced," or, for example, charges have been filed.  ***Commonwealth v. Sherwood***, 982 A.2d 483, 500 (Pa. 2009).  "A subsequent administration of ***Miranda*** warnings to a suspect who has given a voluntary but unwarned statement should ordinarily suffice to remove the conditions that precluded admission of the earlier statement."  ***DeJesus***, 787 A.2d at 406 (citation omitted).

- 15 -

Finally, we note: "[T]he 'fruit of the poisonous tree' doctrine generally requires exclusion of evidence obtained from, or acquired as a consequence of, illegal searches." *Commonwealth v. Gatlos*, 76 A.3d 44, 63 (Pa. Super. 2013) (citation omitted). However, the Pennsylvania Supreme Court has explained:

> In a series of decisions spanning several decades, the [United States] Supreme Court has declined to hold that *Miranda* violations trigger the fruit of the poisonous tree doctrine. This means that, while a defendant's unwarned statement must be suppressed per *Miranda*, any subsequent statements or derivative physical evidence can be admitted at trial so long as the defendant's confession was voluntary.

*Commonwealth v. Bishop*, 217 A.3d 833, 851 (Pa. 2019).

Garcia argues detectives committed numerous violations of his rights in obtaining his statements. First, Garcia recounts that the trial court found the entirety of the first interview, with Detective Knoll on January 11, 2021, was custodial and thus suppressed the statements he made before the *Miranda* warning. Garcia then asserts that: (1) a photo of the Victim and a video of him and his friends, both obtained from his cell phone, were derived from his pre-*Miranda* statements;[5] and thus (2) the trial court should have suppressed this evidence under the fruit of the poisonous tree doctrine. Garcia avers the trial court erred in reasoning that the evidence need not be suppressed as

_____

[5] Although Garcia does not explain so in his brief, at the suppression hearing he argued that officers were only able to access the contents of his phone because his girlfriend provided them with his cell phone number. *See* N.T., 7/29/22, at 17.

fruit of the poisonous tree because Garcia's statements, from which they flowed, were not coerced.

Second, Garcia asserts following the **Miranda** warning given, by mid-interview on January 11, 2021, and at the entirety of the January 21, 2021 interview with Detective Parker, the detectives were "calculatedly ambiguous" and "vague" as to whether they were questioning him on the gun charges or the murder charge. Garcia's Brief at 10, 13. Garcia thus reasons the detectives failed to properly inform him of the criminal transaction about which he was being interrogated. Relatedly, Garcia asserts the detectives violated his Sixth Amendment right to counsel at the second interview, as his right first attached when he was arrested on January 11, 2021, and endured throughout the second interview. **See id**. at 14. Garcia maintains the trial court erred in finding that he waived his right to counsel, as "[i]t is well-established that after the Sixth Amendment right to counsel attaches, [the] right 'does not depend upon any further request by the defendant.'"[6] **Id**. at 15.

---

[6] We note Garcia also argues, for the first time on appeal, that: (1) the detectives improperly "used three powerful psychological stress techniques — confrontation, alternatives, and grabbing attention [*sic*] — to coerce a statement;" and (2) information obtained from his girlfriend — that Garcia "hung [out] with . . . Santiago when [he was] not with his girlfriend" — was illegally-obtained fruits of his pre-**Miranda** statements. Garcia's Brief at 11, 13. Garcia fails to cite to the place in the record where he preserved these claims before the trial court, and our review of the suppression record reveals he did not. Accordingly, he was waived these claims for our review. **See** Pa.R.A.P. 302(a), 2117(c)(1), 2119(e); **see also Jefferson**, 256 A.3d at 1252.

The trial court denied relief as follows. With respect to the seizure of the photo of the Victim and video of Garcia and his friends, the trial court found this evidence were seized pursuant to a valid search warrant. Thus, the court concluded, the detectives did not confront him with any illegally seized evidence. *See* Trial Court Opinion, 7/10/23, at 10. The trial court also reasoned that suppression was not required, under the principle that "the fruit of the poisonous tree doctrine only requires suppression of evidence derived from an un-*Mirandized* statement where the defendant's statement was involuntary or coerced." *Id*. at 11 (*citing Commonwealth v. Santiago*, 980 A.2d 659, 665-66 (Pa. Super. 2009)). The trial court reasoned:

> [Garcia] was well treated during his January 11 interview, and the statement was freely given without coercion. . . . At the suppression hearing, the Commonwealth presented video of the interview and there was no evidence of coercion or manipulation present. [Accordingly], there was no basis to suppress any other evidence as a fruit of the unwarned portion of the statement.

Trial Court Opinion, 7/10/23, at 11.

Finally, the trial court rejected Garcia's claim that he was not properly advised of the criminal transaction on which he was being questioned. In support, the trial court cited Detective Parker's testimony that at the second interview, before any substantive questioning, he informed Garcia "they were there to talk about the murder of the [Victim] and that [Garcia] was being arrested for the murder." *Id*. at 11-12. Additionally, the trial court denied relief on Garcia's claim that he had a Sixth Amendment right to counsel which attached during his first interview and endured through his second. The trial

court reasoned: (1) the first interview pertained only to the gun charges, which were "unrelated to the homicide;" while (2) the second interview concerned "a completely separate act or transaction" — the murder of the Victim. *Id*. at 14. Thus, the trial court concluded that Garcia's Sixth Amendment right to counsel for the murder charge did not attach until he was charged with it on the day of the second interview.

After careful review, we affirm the trial court's rulings, albeit on different grounds for some issues. *See Commonwealth v. Cartagena*, 63 A.3d 294, 301 (Pa. Super. 2013) (*en banc*) (stating that "the suppression court's legal conclusions are not binding on this Court" and "that if the record supports the result reached by the suppression court, we may affirm on any ground"). We address Garcia's arguments *seriatim*.

First, with respect to the detectives' confrontation using the photograph and video obtained from Garcia's cell phone, we determine that no relief is due. The United States Supreme Court and Pennsylvania Supreme Court have "declined to hold that *Miranda* violations trigger the fruit of the poisonous tree doctrine." *See Bishop*, 217 A.3d at 851. Although the trial court suppressed the pre-*Miranda* portion of Garcia's first statement, pursuant to *Bishop*, any "derivative physical evidence can be admitted at trial so long as the [his] confession was voluntary." *Id*. Accordingly, no relief is due.

Second, with respect to whether the detectives properly advised Garcia of the criminal transaction on which they were interrogating him, we point out

that the trial court credited Detective Parker's testimony — that in the second interview, before any questioning began and before the **_Miranda_** warning, he informed Garcia he was under arrest for the Victim's murder and that the detective would question him about the murder. **_See_** N.T., 9/23/22, at 31-32. Furthermore, the trial court found, in the alternative, that Garcia lawfully waived his **_Miranda_** rights at this interview. **_See id_**. at 31. Garcia's argument to the contrary is not entirely clear; he maintains "that after the Sixth Amendment right to counsel attaches, that right 'does not depend upon any further request by the defendant.'" Garcia's Brief at 15. To the extent that Garcia avers he was not required to affirmatively invoke his Sixth Amendment right to counsel, the trial court did not find he failed to do so. Instead, the trial court found Garcia knowingly waived his **_Miranda_** rights after Detective Parker advised him of them. For the foregoing reasons, no relief is due on Garcia's second issue.

In his third issue, Garcia challenges the trial court's denial of his motion to suppress evidence obtained upon execution of the six search warrants. The Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution both require a search warrant to be supported by probable cause. **_See Commonwealth v. Jones_**, 988 A.2d 649, 654 (Pa. 2010). This Court has stated:

> . . . Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The standard for evaluating a search

warrant is a "totality of the circumstances" test[.] A magistrate is to make a "practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." The information offered to establish probable cause must be viewed in a common sense, nontechnical manner. Probable cause is based on a finding of the probability, not a *prima facie* showing of criminal activity, and deference is to be accorded a magistrate's finding of probable cause.

**Commonwealth v. Manuel**, 194 A.3d 1076, 1081 (Pa. Super. 2018) (*en banc*) (citations and footnote omitted).

"A magistrate's finding of probable cause must be based on facts described within the four corners of the affidavit[.]"

. . . [A] reviewing court does "not conduct a *de novo* review of the issuing authority's probable cause determination, but [] simply determines whether or not there is substantial evidence in the record supporting the decision to issue the warrant."

**Id**. at 1093 (citations omitted). "[C]ourts should not invalidate . . . warrants by interpreting affidavits in a hyper[-]technical . . . manner." **Id**. at 1089 (citation omitted).

Garcia argues the trial court erred in denying his motion to suppress the evidence obtained as a result of the search warrants. We reiterate that the police obtained warrants to search the Subaru, Garcia's red iPhone, records for his two phone numbers, the house where he lived with his girlfriend, and his DNA. Garcia avers that the affidavits of probable cause did not set forth: (1) a foundation that the items sought would be found in the areas to be searched; (2) probable cause that evidence of the murder would be found in

each of the areas to be searched; or (3) details for how each item to be searched was connected to the murder.

The trial court addressed each search warrant in turn and found they all contained sufficient probable cause. With respect to the search warrant for the Subaru, the trial court reiterated the evidence summarized above, including the surveillance videos showing a Subaru Legacy with distinctive features, the path of the Subaru to the intersection of 6th and West Sedgely Streets, and information that the suspected shooter lived in that same area. The trial court further reasoned that upon stopping the vehicle, the police apprehended Garcia, the passenger, who was wearing "black sneakers with reflective material on the front consistent with what the shooter was wearing on the night of the murder." Trial Court Opinion, 7/10/23, at 16. The court concluded: "A commonsense, non-technical view of the information provided by the Commonwealth established a fair probability that the [Subaru] would contain evidence of the murder or the identity of the suspect. Accordingly, the warrant was supported by probable cause." *Id*. at 16-17.

With respect to the search warrant for both Garcia's red iPhone and the records for both of his telephone numbers, the trial court considered that Garcia "admitted to using his phone to communicate with Santiago, the getaway car driver." *Id*. at 19-20. The trial court reasoned: "Based on a commonsense, non-technical view of the information, there was a fair probability that [Garcia's] phone [and the phone records] contained evidence

of the murder." *Id*. Additionally, the court noted that "the averments in the second phone record affidavit established that [Garcia] changed his phone number two days after the murder." *Id*. at 20.

With respect to the search warrant for Garcia and his girlfriend's house, the trial court concluded:

> The [h]ouse [a]ffidavit established probable cause to search [Garcia's] residence. A week after the murder, [Garcia] was pulled over in a car matching the description of the getaway vehicle in the same neighborhood that [the Victim's] mother had heard the suspects lived. [Garcia] was wearing clothing consistent with what the shooter wore on the night of the murder. Police found a fanny pack in the car matching the bag the shooter wore before the murder. The fanny pack contained [Garcia's] identification and a 9mm handgun. [Garcia] provided . . . his home address and identified [it] as his girlfriend's house where he was staying. The search warrant was approved just ten days after the murder. Based on this short period and the fact that [Garcia] had retained the sneakers and fanny pack worn during the commission of the crime, there was a fair probability that evidence of the murder would be found in [Garcia's] home. . . .

*Id*. at 21.

Finally, with respect to the search warrant for Garcia's DNA, the trial court reiterated the above evidence, that he was stopped in a vehicle matching the description of the getaway car and wearing similar clothing as the suspect. The court then reasoned:

> Upon a search of the vehicle, police found a fanny pack, consistent with the . . . bag the suspect was seen wearing on video before the shooting, with [Garcia's] identification and a 9mm handgun inside. [Garcia] denied possessing the fanny pack or knowing how his identification got inside. Police submitted the guns found in the car for DNA and latent print analysis.

- 23 -

A commonsense, non-technical view of the information provided by the Commonwealth established a fair probability that [Garcia's] DNA would connect him to the murder or the firearm found in the fanny pack, which was the same caliber as the weapon. . . .

*Id*. at 17-18.

Based on our review, we conclude that the trial court's factual findings are supported by the record and its legal conclusions are free from error. Contrary to Garcia's contentions, the search warrants provided information constituting a fair probability that the items to be searched would lead to evidence of the crime. We note that although the suppression hearing transcripts do not reveal the contents of Garcia's statements to police, on appeal he does not dispute the trial court's observation that he admitted using his phone to contact Santiago, "the driver of the homicide getaway car." *Id*. at 18. We reiterate that we defer to the trial court's findings of fact, and neither this Court nor the trial court conducts a *de novo* review of the issuing authority's probable cause determination. *See Manuel*, 194 A.3d at 1093. Instead, we simply determine whether there was substantial record evidence supporting the decision to issue the warrant. We determine that, based on a totality of the circumstances, the trial court did not abuse its discretion in denying relief on Garcia's claims that all of the search warrants were invalid. *See Goldman*, 252 A.3d at 677. Accordingly, no relief is due on his third claim.

In Garcia's fourth issue, he claims that the trial court erred in denying his request for a hearing pursuant to **Franks**. We consider:

> [**Franks**] held that, where a defendant makes a substantial preliminary showing that a false statement was knowingly and deliberately, or with reckless disregard for the truth, included by an affiant in his application for a search warrant **and** where the alleged false statement was necessary to a finding of probable cause, the Fourth Amendment requires that a hearing be held at defendant's request so that he might challenge the veracity and integrity of the warrant.
>
> "[T]o mandate an evidentiary hearing . . . [t]here must be allegations of deliberate falsehood or of reckless disregard for the truth[.]"

**Commonwealth v. Fletcher**, 307 A.3d 742, 747-48 (Pa. Super. 2023) (citation omitted, emphasis added). Even where a defendant establishes the above factors, if the remainder of an affidavit establishes probable cause, no hearing is required. **See Commonwealth v. James**, 69 A.3d 180, 188 (Pa. 2013).

Garcia asserts that in Santiago's first statement to police on January 11, 2021, Santiago stated: (1) he "dropped off" C-Mo near 5th and Pike Streets; (2) C-Mo "told him that he was going to Reese and Hunting Park for a drug transaction;" (3) Santiago then "drove his Subaru around the block the night of the murder and picked up [C-Mo] on Reese Street after [C-Mo] called him . . . sounding 'all hyped up.'" Garcia's Brief at 16-17. However, Garcia claims, in applying for a search warrant for his cell phone and cell phone records, the Commonwealth "scrubbed [C-Mo's] name from the affidavit" and instead

- 25 -

referred to him as an "unknown 'male,'" creating an inference that Garcia was this person. *Id*. at 17. Garcia asserts the Commonwealth perpetuated a "calculated" falsehood.[7] *Id*. at 19. Garcia maintains that had the affidavit properly included the reference to C-Mo, the issuing authority would not have found probable cause to search Garcia's phone records. *Id*. at 19. Garcia further reasoned the trial court erred, when considering whether the affidavit would have established probable cause, in simply excising the problematic statement and "look[ing] at the remaining evidence to find probable cause." *Id*. at 22. Instead, Garcia claims, the trial court should have substituted the name "C-Mo" for every reference to a "male" and then reviewed the entire affidavit for probable cause. *Id*. Garcia emphasizes that Santiago, who was "the only witness to the crime," identified another person, C-Mo, as the suspect. *Id*. at 23. Garcia thus concludes the trial court abused its discretion by denying a *Franks* hearing.

The trial court considered Garcia's request for a *Franks* hearing at the final suppression hearing. The court found Garcia "made a substantial showing" as to the first *Franks* factor — that the affiant knowingly, intentionally, or recklessly included a false statement in the affidavits of

_____

[7] Garcia repeatedly avers it was the "Commonwealth" who prepared the affidavits of probable cause. *See e.g.*, Garcia's Brief at 21 (averring the Commonwealth's actions violated the Rules of Professional Conduct). We note, however, that it was the police department who applied for and executed the search warrants.

probable cause. **See** N.T., 9/23/22, at 24. However, the trial court found Garcia failed to establish the second prong — that the false statement was necessary for a finding of probable cause. **See id**. at 25. In its opinion, the trial court reasoned:

> [T]he search warrants for [Garcia's] iPhone and phone records were supported by sufficient probable cause **without** the averment that . . . Santiago told police he called a "male" on the night of the murder whom he had been driving around. Accordingly, [Garcia's] claim is without merit and no relief is due.

Trial Court Opinion, 7/10/23, at 23 (emphasis added).

Based on our review, we conclude the trial court's factual findings are supported by the record and its legal conclusions are free from error. Again, Garcia does not dispute the trial court's finding that he admitted to using his cell phone to call Santiago. In the absence of any such discussion by Garcia, we conclude he cannot overcome the trial court's finding that he failed to establish the second **Franks** factor. **See James**, 69 A.3d at 188. Accordingly, Garcia's fourth issue merits no relief.

In his fifth issue, Garcia claims the trial court erred in denying his request for additional *voir dire* questions, relating to improperly obtained confessions. We note:

> The scope of *voir dire* rests in the sound discretion of the trial court, whose decision will not be reversed on appeal absent palpable error. The purpose of *voir dire* is solely to ensure the empanelling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court. Neither counsel for the defendant nor the Commonwealth should be permitted to ask direct or hypothetical questions designed to disclose what a juror's present impression or opinion as to what

- 27 -

his decision will likely be under certain facts which may be developed in the trial of the case. . . .

*Commonwealth v. Bomar*, 826 A.2d 831, 849 (Pa. 2003) (citation omitted).

"[T]he jury selection process is crucial to the preservation of a criminal defendant's constitutional right to an impartial jury." *Commonwealth v. Delmonico*, 251 A.3d 829, 839 (Pa. Super. 2021).

We first set forth the six additional *voir dire* questions requested by Garcia:

> Tell me when, if ever, you think it is acceptable for police to lie to obtain evidence (confession)?
>
> Have you ever heard the saying, "The ends justify the means?" What does this saying mean to you? Do you believe this is applicable to police investigating a crime (interrogating a suspect)?
>
> What is your understanding of the Fifth Amendment right against self-incrimination?
>
> What do you believe are the ethical obligations a police officer should follow when investigating a crime (interrogating a suspect)?
>
> Tell me about a time when you or someone you know followed the rules even when the result was unpleasant.
>
> Tell me about an occasion you heard about a false confession.

N.T., 3/6/23, at 28-29 (some quotation marks omitted).

On appeal, Garcia claims that his requested *voir dire* questions were relevant in light of the police's "questionable techniques to interrogate [him] and intentionally [withholding] material statements from the magistrate to procure a warrant." Garcia's Brief at 39. Garcia asserts that "the questions

were relevant to exclude jurors with preconceived and prejudicial views on police conduct, investigations, and the law." *Id*. at 37. Garcia complains that, contrary to the trial court's reasoning, the standard juror questions did not adequately address these concerns. Garcia also argues the trial court should have "articulate[d] what harm may come by asking further questions." *Id*. at 39. Garcia claims that the trial court abused its discretion by not asking Garcia's proposed questions or, alternatively, fashioning its own questions.

The trial court rejected Garcia's requested *voir dire* questions as follows:

> Here, all of [Garcia's] proposed questions were intended to explore the prospective jurors' personal opinions regarding police interrogation and interview techniques. However, the personal views of the jurors on these matters was not an appropriate topic for *voir dire*. Since [Garcia] intended to discredit at trial inculpatory admissions [he] made to the police, he was entitled to know whether the jurors were biased in favor of, or against, the police, whether they would follow the court's instructions on the law, and whether they would follow the court's instructions regarding the Fifth Amendment and the right to remain silent. All of these topics were covered by the standard questionnaire that was answered by all members of the venire. No more was required.

Trial Court Opinion, 7/10/23, at 28 (unnecessary capitalization, citation, and footnote omitted). The trial court further explained that the standard questionnaire, given in this case, included the following questions:

> 8. Would you be more likely to believe the testimony of a police officer or any other law enforcement office just because of his/her job?

> 9. Would you be less likely to believe the testimony of a police officer or other law enforcement officer just because of his/her job?

11. Would you have any problem following the Court's instruction that the defendant in a criminal case does not have to take the stand or present evidence, and it cannot be held against the defendant if he or she elects to remain silent?

13. In general, would you have any problem following and applying the judge's instructions on the law?

*Id*. at 28 n.8 (paragraph breaks added and quotation marks omitted).  The trial court noted that anyone who answered "yes" to any of these questions was excluded from the group of prospective jurors.  *See id*.

Based on our review, we conclude the trial court did not abuse its discretion in denying Garcia's request for the additional *voir dire*.  Garcia's proposed questions were hypothetical and open-ended, and designed to probe a prospective juror's opinions "opinion as to what his decision will likely be under certain facts which may be developed" during trial.  *Bomar*, 826 A.2d at 849.  It was within the trial court's discretion to deny Garcia's request, especially where his concerns were already addressed by the standard jury questionnaire.  Accordingly, Garcia's fifth issue is meritless.

In Garcia's sixth issue, he challenges the trial court's admission at trial of photographs of him holding a firearm.  In reviewing a challenge to the admissibility of evidence, our standard of review is well-settled and very narrow:

Questions concerning the admissibility of evidence are within the sound discretion of the trial court and we will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion.  An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is

manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.  If in reaching a conclusion the trial court overrides or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.

*Commonwealth v. LeClair*, 236 A.3d 71, 78 (Pa. Super. 2020) (citation omitted).  "[T]he appellant sustains the 'heavy burden' to show that the trial court has abused its discretion." *Commonwealth v. Christine*, 125 A.3d 394, 398 (Pa. 2015) (citation omitted).

"All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible."  Pa.R.E. 402. Nevertheless, a court may exclude relevant evidence if its probative value is outweighed by its potential to cause unfair prejudice.  *See* Pa.R.E. 403. "However, [e]vidence will not be prohibited merely because it is harmful to the defendant.  [The trial court] is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand[.]" *Commonwealth v. Kouma*, 53 A.3d 760, 770 (Pa. Super. 2012).

Generally, evidence of a weapon is not admissible when it cannot be linked to the crime.  *See Commonwealth v. Robinson*, 721 A.2d 344, 351 (Pa. 1998).  "However, there is an exception to this general rule where 'the accused had a weapon or implement suitable to the commission of the crime charged.'" *Id*.  The Commonwealth bears the burden "to lay a foundation that would justify an inference by the finder of fact of the likelihood that the

weapon was used in the commission of the crime." **Christine**, 125 A.3d at 400. "Any uncertainty that the weapon is the actual weapon used in the crime goes to the weight of such evidence." **Id**. (citation omitted).

Garcia argues that the trial court erred in admitting into evidence the photograph of him holding a firearm. Garcia first claims that although evidence suggesting a defendant had access to a firearm **before** a shooting is generally admissible, "courts have long held that evidence suggesting that a defendant had access **after** a shooting is generally inadmissible." Garcia's Brief at 32-33 (*citing* **State v. Parrish**, 595 N.E.2nd 354 (Oh. App. 1991)). Garcia also asserts the Commonwealth failed to lay a proper foundation for the photograph, as the Commonwealth conceded there was "no way of knowing" whether the firearm in the photograph was the firearm used in the shooting. **Id**. at 33. Finally, Garcia argues the photograph had little to no probative value and unfairly prejudiced him by suggesting he "was a reckless, dangerous individual who enjoyed brandishing guns." **Id**. at 34.

The trial court denied relief on Garcia's claim as follows:

> Here, the Commonwealth presented a photograph of [Garcia] holding a firearm that was extracted directly from [his] phone. The evidence showed that this photograph was taken . . . three days after the murder and four days prior to [Garcia's] arrest. Therefore, the Commonwealth properly established that there is a likelihood that the firearm in the photograph was the murder weapon. Moreover, defense counsel conceded that "it can't be ruled out one way or the other" as to whether the weapon in the photograph was the murder weapon. Any uncertainty about whether the firearm was the actual murder weapon goes to the weight of the evidence not its admissibility. . . .

Trial Court Opinion, 7/10/23, at 24-25 (record citations omitted).

Based on our review, we conclude the trial court's factual findings are supported by the record and its legal conclusions are free from error. While Garcia emphasizes that the Commonwealth conceded there was "no way of knowing" whether the firearm he was holding in the photograph was the same firearm used in the shooting, the trial court points out Garcia agreed with this conclusion. *See id*. at 25; *see also* Garcia's Brief at 33. Importantly, Garcia does not dispute the trial court's legal analysis that any uncertainty, as to whether the firearm was the actual murder weapon, goes to the **weight** of the evidence, not its **admissibility**. *See Christine*, 125 A.3d at 400. Furthermore, Garcia does not cite Pennsylvania authority for his proposition that evidence that a defendant possessed a firearm after a shooting is "generally inadmissible," nor does he argue why the Ohio decision should govern this appeal. *See* Garcia's Brief at 33. Finally, Garcia has not shown that, against all the other evidence summarized by the trial court above, the photograph was so prejudicial as to require its exclusion. *See Kouma*, 53 A.3d at 770; *see also Commonwealth v. Hairston*, 84 A.3d 657, 671-72 (Pa. 2014) (stating the erroneous admission of evidence may be harmless error if the error did not prejudice the defendant or "properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict"). The trial court was not required to sanitize

the evidence admitted at trial to Garcia's benefit.  **See id**.  Accordingly,
Garcia's sixth issue is meritless.

In his final issue, Garcia challenges the trial court's denial of his request
for jury instructions on missing evidence, namely the video of Santiago's first
interview, in which he named C-Mo as the passenger in his Subaru.[8]

By way of background, we first summarize that the missing evidence
jury charge, at Pennsylvania Suggested Standard Criminal Jury Instruction
3.21(B), states:

> If three factors are present, and there is no satisfactory
> explanation for a party's failure to produce an item, the jury is
> allowed to draw a common-sense inference that the item would
> have been evidence unfavorable to that party.  The three
> necessary factors are:
>
> **First**, that the item is available to that party and not to the
> other;
>
> **Second**, that it appears the item contains or shows special
> information material to the issue; and
>
> **Third**, that the item would not be merely cumulative
> evidence.

Pa. SSJI (Crim) § 3.21B (emphasis in original).

---

[8] Garcia has preserved this issue, as he objected to the absence of the
instruction after the trial court instructed the jury, and before the jury retired
to deliberate.  **See** N.T., 3/8/23, at 182; **see also Commonwealth v. Moury**,
992 A.2d 162, 178 (Pa. Super. 2010) (providing that generally, a defendant
waives an appellate challenge to the propriety of the jury charge if he responds
in the negative when the court asks whether additions or corrections to a jury
charge are necessary).

Garcia asserts that because the video of Santiago's interview "was lost without explanation," the trial court should have given a jury charge on this missing evidence. Garcia first argues the first prong of the standard jury instruction is incorrectly phrased to require the evidence "*is* missing," and instead the instruction should state the evidence "*was* missing." Garcia's Brief at 35 (emphases added). Garcia then avers the trial court abused its discretion by "misinterpreting the jury instruction" and "fail[ing] to recognize the absurd result" in requiring the evidence to still be in the Commonwealth's possession. *Id*. at 36 (averring the trial court "wrongly found that the . . . instruction was inapplicable because the Commonwealth . . . could not locate the" video). Garcia then contends that when we apply the "proper" interpretation, "all three elements of the missing evidence are met." *Id*. Garcia also claims the video was integral to his case, as Santiago identified C-Mo as the person he picked up in his Subaru Legacy after the shooting. Garcia also alleges the video was purposely lost to hide Detective Parker's misconduct. Finally, Garcia argues the video was not cumulative of the written summary of Santiago's interview, because a "summary can never replace the visual," and there was "no way to know if the summary was accurate." *Id*. at 37.

Garcia presents all of the above arguments for the first time on appeal. At trial, Garcia merely requested the missing evidence instruction. *See* N.T., 3/8/23, at 179-80 (defense counsel stating "it dawned on me to request a

- 35 -

missing evidence instruction for . . . Santiago's January 11th, 2021 interview that we discussed was missing"). The Commonwealth responded: (1) Detective Parker testified he did not know why the Commonwealth did not have the video; (2) the video would have been merely cumulative of the detective's activity sheet and "portions of the affidavit;" and (3) the Commonwealth believed it "would not have been able to play that video anyway." *Id*. at 180-81. The trial court ruled Garcia was not entitled to the instruction, reasoning: (1) Santiago's out-of-court statement would have been inadmissible hearsay; (2) the video did not contain "special information" as required by the instruction, because the video was duplicative of the detective's activity sheet; and (3) the probative value of the video would have been *de minimus*. *Id*. at 182-83. Garcia did not respond to any of the Commonwealth's and the trial court's discussion, nor present any argument in support of his request for the missing evidence jury instruction. Accordingly, he has waived all of his present arguments for our review. *See* Pa.R.A.P. 302(a).

Moreover, even if Garcia had preserved this issue, we would determine no relief is due. We note the applicable standard of review:

> In reviewing a challenge to the trial court's refusal to give a specific jury instruction, [we] determine whether the record supports the trial court's decision [and] whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate[.]

*Commonwealth v. Sandusky*, 77 A.3d 663, 667 (Pa. Super. 2013) (citation omitted).

The trial court considered Garcia's sixth issue and determined that it lacked merit. The trial court reasoned:

[The prosecutor] advised the [trial] court that she never obtained possession of the video of Santiago's interview, and that she looked for it but did not find it. She further told the court that defense counsel apprised her of a conversation he had with the previous prosecutor . . . , who told him that the Commonwealth did not have possession of the video of Santiago's interview. As [Garcia] failed to proffer any evidence that the Commonwealth had access to the video, the first requirement [for a missing evidence instruction] was not met.

Moreover, [Garcia] failed to demonstrate how this piece of evidence contained special information material to an issue in his case. A video from Santiago's interview would merely contain an out-of-court statement of an uncooperative and non-testifying co-defendant, which is inadmissible hearsay. Further, Santiago's interview was summarized in the affidavit of probable cause for the search warrant for [Garcia's] phone, as well as the police activity sheet. Therefore, a video of Santiago's interview would have minimal probative value.

Trial Court Opinion, 7/10/23, at 26 (unnecessary capitalization and record citations omitted).

Based on our review, we conclude that the record supports the trial court's denial of Garcia's request for a missing evidence jury instruction. The Commonwealth advised the trial court that it did not have the video of Santiago's interview. Furthermore, Garcia does not dispute the trial court's summation above, that his counsel told the present prosecutor that the prior prosecutor "told him that the Commonwealth did not have possession of the

video." ***See id***. We conclude the record supports the trial court's finding that Garcia failed to show the first prong of the missing evidence instruction — that the Commonwealth ever had the video. ***See*** Pa. SSJI (Crim) § 3.21B. Accordingly, the trial court did not abuse its discretion in denying Garcia's request for the instruction. His seventh and final issue merits no relief.

For the foregoing reasons, we determine Garcia is not entitled to relief on any of his issues. We thus affirm the judgment of sentence.

Judgment of sentence affirmed.

Judge Stabile joins the memorandum.

President Judge Lazarus concurs in the result.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>10/30/2024</u>